Filed
D.C. Superior Court
07/23/2020 21:00PM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

-----------------------------------------------------------------X

TERRI D. WRIGHT
204 Beacon Place NE
Washington, DC 20011

                                                 2020 CA 003266 B

Plaintiff,

              -against-                                    **VERIFIED COMPLAINT**

EUGENE & AGNES E. MEYER FOUNDATION,        **Jury Trial Demanded**
1250 Connecticut Avenue NW
Suite 800
Washington, DC 20036

and NICOLA O. GOREN,
4228 Alton Pl NW
Washington, DC 20016

Defendants.
-----------------------------------------------------------------X

      Plaintiff TERRI D. WRIGHT, by and through her counsel, THE COCHRAN FIRM, as and for her Verified Complaint against Defendants, respectfully sets forth and alleges:

### PRELIMINARY STATEMENT

      The Eugene and Agnes E. Meyer Foundation (hereinafter "the Meyer Foundation") was established in 1944 by Eugene Meyer, founder of the Washington Post, and his wife, Agnes E. Meyer, a tireless Civil Rights advocate. Since its inception, the Meyer Foundation had been a well-regarded philanthropic organization providing grants aimed at advancing charitable and educational initiatives within the District of Columbia metropolitan region, which encompasses the District of Columbia, Maryland and Northern Virginia.

      In recent years, the Meyer Foundation has increased its focus on supporting grants aimed at addressing issues of racial inequity within the community it serves. In fact, while Dr. Terri Wright, Plaintiff, served as the Vice President of Program and Community, the Meyer

1

Foundation gave nearly $3.6 million in grants to organizations committed to advancing racial equity causes within the District of Columbia metropolitan area. This significant accomplishment for the Meyer Foundation was possible through the work and contributions of Dr. Wright.

Despite the Meyer Foundation's external pledge to aid outside organizations with financial support dedicated to addressing issues of racial inequity, it has, under the direction of its current President and Chief Executive Officer, Defendant Nicola Goren, wholly failed in implementing racial equity within the Meyer Foundation itself. This failure by Defendant Goren to address these issues evidenced her racial animus against Plaintiff. It also presaged the termination of Plaintiff's employment, the subsequent breach of her contract, the violation of her Civil Rights and the making of false and defamatory statements about her.

Prior to Dr. Wright joining the Meyer Foundation, Defendant Goren had her staff engage in discussions surrounding racial equity within their work environment during the Summer of 2017. During these discussions, several employees of color shared their own concerns and experiences regarding race issues within the Meyer Foundation after being encouraged to do so. However, many later felt that their concerns went disregarded and were done only as a ploy to make it appear as if the Meyer Foundation cared about issues of race inside the company. These staff members felt the Summer of 2017 was merely an all "talk" endeavor orchestrated by Defendant Goren. This sentiment was further reflected in the internal surveys staff were requested to complete in 2018.

Despite this culture, the Plaintiff was extremely productive in her work at the Meyer Foundation. She garnered Board support for many of her proposals and projects, fostered close relationships with her direct reports and introduced an efficient transition plan to assist the Meyer

Foundation in its rebranding campaign. Dr. Wright's significant contributions to the Meyer Foundation were meaningless to Defendant Goren who made the decision to fire the Plaintiff without cause or justification. As part of the termination process, Defendant Goren and the Meyer Foundation entered into a contract that set forth certain conditions to which each party was to be bound. One of the provisions was that neither Defendant Goren nor the Plaintiff would disparage each other or the Meyer Foundation. Ironically, despite Defendant Goren's profile on the Meyer Foundation's website which states, "I am rooted in integrity," she breached the contract and acted without integrity by telling the then President and CEO of the Washington Regional Association of Grantmaker's (WRAG), Dr. Madye Henson, that Dr. Wright was "toxic," created "a negative climate" at the Foundation and had to be fired.

This violation of the non-disparagement clause of the Contract was done with racial animus in violation of 42 U.S.C. 1981 which prohibits discrimination in the making and enforcement of contracts. The discriminatory animus is clear since Defendant Goren has not disparaged any non-African American employee who has left the company, let alone any non-African American who left the company with a contract that specifically contained a mutual non-disparagement clause. For example, in contrast to the defamation Defendant Goren heaped on Dr. Wright, Defendant Goren did not defame Dr. Wright's predecessor, a Caucasian man, who also separated from the company.

The way that Dr. Wright learned of this disparaging and defamatory commentary about her was by reading the allegations of a Civil Rights complaint that Dr. Henson, filed against Defendant Goren accusing Goren of orchestrating an illegal termination of Dr. Henson based on her race as an African American. This lawsuit, filed in the District of Columbia Superior Court, on June 30, 2020, bearing case number 2020 CA 002934 B, is against WRAG, Defendant Goren

3

(Defendant Goren is WRAG's Board Chair) and others alleging discrimination and retaliation. In the complaint, Dr. Henson, who had no prior relationship with Dr. Wright, made clear that during a one on one meeting with Defendant Goren, the topic of Dr. Wright's departure came up and in response Defendant Goren made disparaging comments that were in blatant violation of Dr. Wright's contract.

This lawsuit is brought to redress the harm done to Dr. Wright as a result of Defendant Goren and the Meyer Foundations' breach of contract, violation of civil rights and defamation.

## NATURE OF THE CLAIMS

1. This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' conduct taken against the Plaintiff, including Defendants' defamation, violations of 42 U.S.C. §1981 and breach of contract.

2. Defendants' conduct was knowing, malicious, willful, wanton and/or showed a reckless disregard for Plaintiff. As a result, the Plaintiff has suffered and continues to suffer economic and non-economic damages, permanent harm to her professional and personal reputations as well as severe emotional distress.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this matter because the contract at issue lists the District of Columbia as having Jurisdiction.

4. Venue of this action is based upon the contract at issue that lists the District of Columbia as being the proper place for Venue.

5. Jurisdiction and venue in the contract at issue sets forth that: "[t]his revised letter agreement shall be interpreted and construed by the laws of the District of Columbia, without regard to conflict of laws provision. You hereby irrevocably submit to and acknowledge and

recognize the jurisdiction of the courts of the District of Columbia, or if appropriate, a federal court located in the District of Columbia (which courts, for purposes of this revised letter agreement, are the only courts of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this revised letter agreement or the subject matter hereof."

## PARTIES

6. Plaintiff, Dr. Terri Wright, is and was at the time of the occurrence a resident of the District of Columbia.

7. Defendant Eugene & Agnes E. Meyer Foundation (hereinafter "Defendant Meyer Foundation") is a private charitable organization with its principal place of business at 1250 Connecticut Avenue, NW, Suite 800, Washington, DC 20003. At all relevant times, Defendant Meyer Foundation entered into the Agreement at issue with the Plaintiff and participated directly in the defamation, breach of contract and violations of 42 U.S.C. § 1981. Moreover, at all relevant times, Defendant Meyer Foundation employed Defendant Nicola Goren.

8. At all relevant times, Defendant Nicola Goren ("Defendant Goren") was the President and Chief Executive Officer ("CEO"), and she participated directly in the defamation, breach of contract and violations of 42 U.S.C. § 1981.

## PROCEDURAL REQUIREMENTS

9. All conditions and requirements precedent to the commencement of this action have been met.

**FACTUAL ALLEGATIONS**

**Dr. Wright's Professional and Educational Background**

10. Dr. Wright has and continues to dedicate her professional career to advancing racial and social equity within historically challenged areas such as housing, education, economic well-being and public health. In her pursuit of addressing these glaring inequities that plagued low-income and communities of color, Dr. Wright has held different leadership positions at various governmental, private and public institutions such as American Public Health Association ("APHA"), W.K. Kellogg Foundation, Michigan Department of Public Health and the Georgia Department of Health and Human Services.

11. Examples of Dr. Wright's exemplary leadership and commitment are demonstrated by her accomplishments in each of the positions she has held. For example, during Dr. Wright's tenure at APHA she spearheaded initiatives geared toward identifying the multiple forms of racism as social determinants compromising health and well-being in addition to retaining subject matter experts on the aforementioned to advance the Association's equity agenda. And, prior to Dr. Wright's tenure at APHA, her work at the W.K. Kellogg Foundation included prioritizing the Foundation's internal diversity and inclusion efforts to help ensure its grantmaking was committed to initiatives focused on undoing racism and achieving equity. Moreover, while working at the Michigan Department of Public Health and Georgia Department and Health and Human Services/Public Health Division, Dr. Wright dedicated her role to ensuring women and children had quality access to healthcare despite their socioeconomic status or race.

12. To this end, Dr. Wright was eager to pursue a new opportunity as Vice President for Program and Community at the Meyer Foundation which according to its stated mission and

history, advanced the causes that Dr. Wright loved regarding racial equity in housing, education, and economic well-being.

### Dr. Wright's Tenure at the Meyer Foundation

13. As part of the Meyer Foundation's plan to better its grantmaking strategy, Defendant Goren hired Dr. Wright to lead the Foundation in a new strategic direction. Specifically, the Meyer Foundation was looking to change their grantees to whom it has traditionally provided funding, in favor of grantees committed to taking on a more active role of advocacy in pursuit of racial equity within the community.

14. On account of Dr. Wright's stellar experience, she was selected to interview for the position of Vice President of Program and Community, which included undergoing five rounds of interviews with various Board Members, staff members, and Defendant Goren. After successfully completing the interview process, Dr. Wright was hired in February 2018.

15. When Dr. Wright came on board, she learned that she was hired to replace Rick Moyers, a Caucasian male, who previously held the title of Vice President of Program and Communications. However, in light of the Meyer Foundation's new direction, Mr. Moyers' previously held position was changed to reflect Dr. Wright's title at the time she was hired.

16. Defendant Goren shared with Dr. Wright the circumstances behind Mr. Moyer's separation and the events leading up to her decision to terminate him. Nothing that Defendant Goren said about Mr. Moyers was disparaging, rather she made it appear as if his departure was just a disagreement over vision. Defendant Goren was amiable regarding Mr. Moyer's termination allowing him to leave the Meyer Foundation on his own terms that did not adversely affect his reputation within the philanthropic community. In contrast, this was not the treatment that Dr. Wright received by Defendant Goren following her termination.

17. In her role as Vice President of Program and Community, the Plaintiff was responsible for overseeing the Foundation's programs and community engagement efforts, which, included, but was not limited to the implementation and integration of the Foundation's key strategies of grant making, capacity building, collective action and advocacy across the region. Dr. Wright oversaw all programming within the following territories: District of Columbia, Maryland and Northern Virginia.

18. As soon as Dr. Wright came onboard, staff members confided in her the hardships that occurred under Defendant Goren's leadership which heightened during the Summer of 2017 and continued thereafter. During this summer, many of the staff reported they went through "painful" and uncomfortable discussions relating to racial equity within the Meyer Foundation. These discussions were led by Defendant Goren. But many of the participants felt that the concerns raised in the discussions fell on deaf ears as no meaningful change was implemented to address their shared complaints. In fact, an African-American male staff member described these discussions as mere "talk" under the guise of making it appear as if the Meyer Foundation cared.

19. Ultimately, in June 2018, Aisha Alexander-Young was hired to implement racial equity within the organization as the Senior Director of Strategy and Racial Equity. One of Ms. Alexander-Young's first initiatives during her tenure was to launch a survey for the Meyer Foundation's employees. The results, which came back some time in the Fall of 2018 showed that employees of color within the organization felt uncomfortable and believed that their race negatively impacted their work environment. The feedback also documented a lack of trust in the leadership and management of the Foundation. In response, no meaningful action was taken to address these glaring issues.

20. Moreover, in October 2018, one of the Meyer Foundation's African-American Program Assistants left the organization feeling as if she was being set up for failure on account of her race. Upon Dr. Wright's hiring, Defendant Goren warned the Plaintiff that the employee may not be "well-suited" for the job and it was up to Dr. Wright to determine how she would manage the African-American Program Assistant. When Dr. Wright met with this Program Assistant and assured her that she would work with her in keeping her job, the employee still did not feel comfortable and left the Meyer Foundation. She complained to Dr. Wright that she felt she was being forced out because of her race and did not believe that Dr. Wright would have the authority to override the pervasive discrimination she was forced to endure.

21. Although Dr. Wright addressed staff members' complaints about the hostile work environment to which they were subjected on account of their race, she did not create this toxic environment. In fact, Dr. Wright excelled in her new role and worked with the staff to improve performance and to foster a racially equitable work environment.

22. As part of her efforts to help the Meyer Foundation advance racial equity within the region, she developed a framework to facilitate the Foundation's transition of removing direct service grants and grantees from the Foundation's portfolio to allow for grantmaking aimed at combating systemic racism. Dr. Wright's framework garnered Board support and the Board authorized funding to support her framework. Moreover, in furthering the Foundations' vision, Dr. Wright established a mechanism to collect demographic data from prospective grantees to ensure the Meyer Foundation was working with minority owned and/or directed organizations.

23. Moreover, during Dr. Wright's first year and a half at the Meyer Foundation, she spearheaded significant initiatives including the following:

- Formulating a strategy positioning the Meyer Foundation as taking the lead in developing a regional strategy amongst philanthropic organizations for the 2020 Census.

- Participating in and promoting the "Get Out the Vote" campaign both within the Foundation, and also throughout the region.

- Leading the philanthropic response to the 2018-2019 Federal Government shutdown by expediting grants to nonprofit organizations that provided direct services to assist those economically impacted by the Federal Government shutdown.

- Redesigning programmatic presentations for reviewing and approving prospective grantees by Board Members to increase efficiency focused on strategy and not tactics.

- Revamping the Program Associate Position to better meet the grant making needs of the program team and to optimize the current Program Associate's skillsets and experiences.

- Leading developmental work for new youth engagement focused on cultivating a new generation of community leaders and advocates.

24. At the end of 2018, the Plaintiff received a favorable performance evaluation from Defendant Goren. In addition, despite not having worked at the Meyer Foundation for an entire year, Defendant Goren gave Dr. Wright a raise in salary..

25. Despite her accomplishments and accolades within her first year, Defendant Goren began to paper trail her in the feedback she provided during Dr. Wright's 2018 Year End Evaluation. Defendant Goren could not criticize Dr. Wright for her objective performance and instead praised her for a "strong year," acknowledged that she "contributed to the advancement of [the Foundation's] mission, vision and goals," and stated that "[a]s far as contributions and deliverables Terri hit the ground running as a VP and has been highly productive. I appreciate having a partner who is on the same page in terms of the vision for our direction and our work, with a strong point of view in how to execute against that mission." She further lauded the Plaintiff for having "[d]eveloped and presented a cohesive request and plan for respectfully transitioning organizations that do not fit in the new strategy, which resulted in the Board

10

unanimously approving efforts to increase the grant target over two years and accommodate the transition." So instead of attacking Dr. Wright's objective deliverables for the Foundation, Defendant Goren raised subjective and false criticism aimed at interpersonal skills and communication issues that no one in the organization had raised previously.

26. The Plaintiff was bewildered by this feedback as she never received such feedback from prior employers, colleagues or direct reports. In fact, when the Plaintiff asked Defendant Goren to provide greater detail, she merely brushed her off and told her that she was "too busy in the weeds." However, this was a mere pretext to mask her discriminatory animus against the Plaintiff. In fact, Dr. Wright's 2019 Work Plan, which was endorsed by Defendant Goren, acknowledged that there were areas within her assigned territory that required her own personal deeper engagement and a long term substantive commitment to "lay the pathway for transformation." As such, this level of engagement by Dr. Wright was required for her to succeed in her role and acknowledged by Defendant Goren.

27. In light of this feedback, at the direction of Defendant Goren, Dr. Wright began to have lunch with all staff to increase face time with them on a personal basis rather than working lunches and even engaged a professional coach to assist her in this purported need for development as identified by Defendant Goren. Notably, as Dr. Wright encouraged an open-door policy with her team, whenever she met with her staff they appeared very comfortable discussing all facets of their work experience and did not offer any areas of concern in Dr. Wright's leadership.

28. In light of the work she was doing to address these pre-textual areas of concern identified by Defendant Goren, the Plaintiff was encouraged when she received her check-in for January 2019 to April 30, 2019. Dr. Goren wrote that it "appears that Terri has been working on

11

her communication and relationship with her team and that things feel less charged than at the end of last year."

29. During the June 2019 Board meeting, Dr. Wright presented her 2020 Census Plan to the Board which identified the significance of encouraging participation in the 2020 Census and approaches the Meyer Foundation could take to be the leader on this front. Moreover, Dr. Wright led her team's presentation on redesigning the grant making process. Both of these initiatives were not only approved by the Board, but received great praise.

30. After receiving Board Approval during the June 2019 meeting, Dr. Wright dedicated her time to implementing the grant making process redesign with her team and continued her duties without any criticism or concern raised by her direct reports or Defendant Goren.

**Defendant Goren's Abrupt and Unlawful Termination of Dr. Wright**

31. Without any notice, warnings or an opportunity to have any discussions regarding her termination, Defendant Goren abruptly terminated the Plaintiff pre-textually claiming she was being fired because of her purported ongoing interpersonal and communication skills. When the Plaintiff asked for specific examples, Defendant Goren discriminatorily refused to provide any, something that she did not do with her Caucasian staff members.

32. Further evidencing Defendant Goren's discriminatory set up of Dr. Wright, Defendant Goren continuously undermined Dr. Wright's authority with her team despite Dr. Wright's repeated complaints. Specifically, Defendant Goren encouraged Dr. Wright's team to visit with her to discuss their roles, assignments and team dynamic. When Dr. Wright requested to be involved in these discussions, Defendant Goren dismissed her requests.

12

### Dr. Wright's Severance Agreement with Defendant Meyer Foundation

33. In October 2019, Dr. Wright, seeking to avoid litigation over potential claims against Defendant Goren and the Foundation regarding the termination, negotiated and entered into a contract labelled as a severance agreement. Critically important to Dr. Wright as part of the negotiations was a mutual non-disparagement clause due to her concerns with the pre-textual, false and subjective statements that Defendant Goren made about Dr. Wright's interpersonal skills. Eventually, Dr. Wright was able to enter into an acceptable agreement with Defendant Meyer Foundation and Defendant Goren.

34. The Agreement contained a Mutual Non-Disparagement Clause, which sets forth:

> "You agree that you have not made and will not make, any false, disparaging or derogatory statements to any person or entity, including any media outlet, industry group or financial institution, regarding the Foundation or any of the releases, or about the Foundation's business affairs and/or financial conditions; provided, however, that nothing herein prevents you from making truthful disclosures to any governmental entity or in any litigation or arbitration. Likewise, the Foundation will direct those officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding you."

### Defendant Goren's Breach of Contract and Public Disparagement of Dr. Wright

35. The month following the parties' execution of the severance agreement, in or around early November 2019, Defendant Goren met with Dr. Madye Henson, former President and CEO of Washington Regional Association of Grantmakers ("WRAG") in her capacity as WRAG's Chair of the Board of Directors.

36. During Defendant Goren's offsite meeting with Dr. Henson, Defendant Goren complained that she was feeling backlash from abruptly terminating Dr. Wright. In response to Defendant Goren, Dr. Henson shared that many leaders in the community are questioning her

decision and believe that Defendant Goren's termination of the Plaintiff was discriminatorily motivated.

37. During the conversation with Dr. Henson, Defendant Goren acknowledged that she sensed this was the perception but claimed that she had no option. Defendant Goren disparaged and defamed Dr. Wright by falsely stating Dr. Wright was "toxic" fostered a "a negative climate" within the Meyer Foundation and had to be fired or two-thirds of the staff would leave.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Race Discrimination in Violation of 42 U.S.C. § 1981 as Against all Defendants)**

38. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 37, inclusive, as if fully set forth herein.

39. Defendants' conduct, by and through its agents, in treating Plaintiff in the manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of her race in violation of 42 U.S.C. § 1981 in the terms, conditions, privileges and enforcement of her Severance Contract that was entered into for that purpose.

40. Defendants in failing to remedy the treatment to which Plaintiff was subjected, despite the Defendants' knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions, privileges and enforcement of her Severance Contract. Plaintiff was disparaged in violation of the terms of the Agreement due to the Defendants' racial animus against African Americans in violation of 42 U.S.C. 1981. The result of this violation has caused the Plaintiff to experience severe economic loss, reputational harm, emotional distress and depression.

41. The discriminatory acts of the Defendants as described above were alleged to show the intentional and racially motivated decision of Defendants to violate the terms and conditions of the Severance Contract. Defendants have not engaged in similar conduct related to non-African American employees.

42. As a result of the Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical, reputational and emotional harm.

43. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Defamation as against Defendant Goren)**

44. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 43, inclusive, as if fully set forth herein.

45. After the parties entered into a Severance Agreement with the Defendants, Defendant Goren falsely told Dr. Henson, a non-party to the Agreement, that Dr. Wright was "toxic" and created a "negative climate" at the Meyer Foundation during a business meeting involving WRAG.

46. Defendant Goren's statement that she was "toxic" and created a "negative climate" within the Meyer Foundation is false and unsupported by any feedback she received during her tenure there not only by staff, but by Defendant Goren herself. In fact, Defendant Goren made these false statements to mask her discriminatory decision to terminate Dr. Wright after many in the philanthropic sector began questioning her discriminatory animus.

47. As a result of these defamatory statements, Plaintiff has and will continue to suffer financial loss and reputational harm into the foreseeable future.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

48.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 47, inclusive, as if fully set forth herein.

49.     The parties entered into an agreement that explicitly provided that the Meyer Foundation "will direct those officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding" the Plaintiff.  Defendant Goren signed this agreement and was therefore aware of this material term.

50.     Despite this mutually agreed upon and material provision in the Agreement, the Defendants unequivocally breached the terms of the Agreement when Defendant Goren falsely told Dr. Henson that she had no choice but to terminate Dr. Wright because she was "toxic" and created a "negative environment."

51.     As a result of the Defendants' breach of the Agreement, the Plaintiff suffered significant economic, reputational and emotional harm.

### DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A.     Declare that Defendants intentionally and willfully denied plaintiff equal rights in the making and enforcement of the Severance Contract by disparaging her on account of her race in violation of 42 U.S.C. § 1981;

B.     Declare the Defendants breached their mutually executed Severance Agreement by making false statements regarding the Plaintiff;

C.     Declare that Defendant Goren defamed the Plaintiff; and

D.     Award of compensatory damages to Plaintiff;

E.     Award of punitive and liquidated damages to Plaintiff;

F.   Award attorney's fees and costs;

G.   Award of interest and costs;

H.   Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.

Dated:  New York, New York
        July 23, 2020

                                                Yours etc.,

                                                THE COCHRAN FIRM
                                                Attorneys for Plaintiff


                                                _____/s/_____
                                                DEREK S. SELLS
                                                DC Bar # 420398
                                                55 Broadway, 23rd Floor
                                                New York, NY 10006
                                                Tel No.:  (212) 553-9215
                                                Fax No.: (212) 227-8763
                                                Dsells@cochranfirm.com

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK )
      ).SS:
COUNTY OF NEW YORK)

      The undersigned, an attorney, duly admitted to practice law in the Courts of the State of New York and The District of Columbia, and hereby deposes and states that:

      I am the Managing Partner of THE COCHRAN FIRM, attorneys for the plaintiff in the above action. I have read the annexed COMPLAINT and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon the following: investigation, interviews with client, records, reports, documents, correspondence, data, memoranda, etc., contained in the file.

      The reason I make this verification instead of plaintiff, is that the Plaintiff resides out of the County of New York, wherein I maintain my offices.

      I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
       July 23, 2020

                                             /s/
                                      DEREK S. SELLS



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
*500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001*
*Telephone: (202) 879-1133 • Website: www.dccourts.gov*

TERRI D. WRIGHT
    Vs.                                                        C.A. No.     2020 CA 003266 B
EUGENE & AGNES E. MEYER FOUNDATION et al

# INITIAL ORDER AND ADDENDUM

    Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

    (1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

    (2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

    (3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

    (4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

    (5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

    (6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                                                                                  Chief Judge Robert E. Morin

Case Assigned to: Judge ROBERT R RIGSBY
Date:  July 24, 2020
Initial Conference: 10:00 am, Friday, October 23, 2020
Location:  Courtroom 201
         500 Indiana Avenue N.W.
         WASHINGTON, DC  20001

# ADDENDUM TO INITIAL ORDER AFFECTING
# ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Robert E. Morin