IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERRI D. WRIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EUGENE & AGNES E. MEYER | ) |
| FOUNDATION, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 1:20-cv-02471-KBJ

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Respectfully Submitted,

THE COCHRAN FIRM
Attorneys for Plaintiff
Tracey L. Brown, Esq. (DC Bar No. 450898)
Derek S. Sells, Esq. (DC Bar No. 420398- Admission Pending in this Court)

55 Broadway, 23rd Floor
New York, NY 10006
Tel No.: (212) 553-9215
Fax No.: (212) 227-8763
tbrown@cochranfirm.com
dsells@cochranfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT...........................................................................1

FACTS ALLEGED IN THE COMPLAINT........................................................4

THE CAUSES OF ACTION AGAINST THE DEFENDANTS........................11

    First Cause of Action: Race Discrimination in Violation of 42 U.S.C. §1981 as to all Defendants.................................................................................................11

    Second Cause of Action: Defamation as against Defendant Goren.........................12

    Third Cause of Action: Breach of Contract...............................................12

HENSON AMENDED COMPLAINT................................................................13

LEGAL ARGUMENT......................................................................................15

    I.    DEFENDANTS FAILED TO MEET THE STANDARD FOR DISMISSAL PURSUANT TO FRCP 12 (b)(6)........................................15

    A. Standard for Dismissal Pursuant to FRCP 12(b)(6)................................15

    B. Plaintiff Sufficiently Pled a Claim of Race Discrimination Pursuant to 42 U.S.C. § 1981.................................................................................................15

        1.    Plaintiff is Not Barred From Recovering for Reputational Harm.................................................................................................17

    C. Plaintiff Sufficiently Pled a Defamation Claim Against Defendant Goren.....18

        1.    Defendant Goren and Dr. Henson do not have a Common Interest Allowing Defendant Goren to Invoke the Common Interest Privilege.................................................................................................19

        2.    Plaintiff Sufficiently Established She Suffered Harm on Account of Defendant Goren's Defamatory Statements.....................21

    D. Plaintiff Sufficiently Pled that Defendant Goren was a Party to the Agreement and That Defendants Breached it...............................................22

CONCLUSION...............................................................................................25

## Cases

Armenian Assembly of American, Inc. v. Catesjian, 597 F. Supp.2d 128 (D.D. C. 2009)........21

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).....................................................15

Carter v. Hahn, 821 A.2d 890 (D.C. 2003)..........................................................18

Caudle v. Thomason, 942 F.Supp. 635 (D.D.C. 1996)..............................................21

Dickerson v. District of Columbia, 2019 WL 6910043 (D.D.C. Dec. 19, 2019)...................17

Friends Christian High School v. Geneva Financial Consultants, et al., 39 F.Supp.3d 58 (D.D.C. 2014)......................................................................................................25

Guttenberg v. Emery, 41 Supp.3d 61.................................................................24

Johnson v. Ry. Express Agency, Inc., 421 U.S. 454 (1975)........................................17

Jones v. Quintana, 872 F. Supp.2d 279 (D.D.C. 2012)..............................................24

Jorgensen v. Mass. Port Auth., 905 F.2d 515 (1st Cir. 1990).......................................17

Marshall v. Honeywell Technology Solutions, Inc., 536 F.Supp.2d 58 (D.D.C. 2008)............16

Morris v. Carter Global Lee, Inc., 997 F.Supp.2d 27 (D.D.C. 2013)...........................15, 16

Moss v. Stockard, et al., 580 A.2d 1011 (D.C. 1990)............................................18, 21

Nanko Shipping, Guinea v. Alcoa, Inc., 330 F. Supp. 3d 439 (DCDC 2018).......................17

Nyambal v. Alliedbarton Security Services, Inc., 344 F.Supp. 3d 183 (D.D.C. 2018).........19, 21

Olinger v. American Sav. & Loan Ass'n, 409 F.2d 142 (D.C. 1969)................................18

Payne v. Clark, et al., 25 A.3d 918 (D.C. 2011).....................................................20

Preston v. Land, 255 S.E.2d 509 (Va. 1979).........................................................21

Redding v. Edwards, 569 F.Supp.2d 129 (D.D.C. 2008)............................................15

Sandvig v. Sessions, 315 F.Supp.3d 1 (D.D.C. 2018)..................................................4

Saad v. Burns Intern. Sec. Services, Inc., 456 F. Supp. 33 (D.D.C. 1978)..........................17

Sagalyn v. Foundation for Preservation of Historic Georgetown, 691 A.2d 107 (DCCA 1997)..24

Teltschik v. Williams & Jensen, PLLC, 2012 WL 3960606 (D.D.C. Sept. 10, 2012)..............17

Weyrich v. New Republic, Inc., 235 F.3d 617 (D.D.C. 2001).......................................18

Wood v. Am. Fed'n of Gov't Employees, 316 F. Supp. 3d 475 (D.D.C. 2018)....................21

*Statutes*

FRCP 12(b)(6)..............................................................................................................1, 8

42 U.S.C. § 1981................................................................................................................passim

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**TERRI D. WRIGHT,**                    )
                                        )
    **Plaintiff,**        )
                                        )
**v.**                                  )
                                        )     **Civil Action No. 1:20-cv-02471-KBJ**
**EUGENE & AGNES E. MEYER**             )
**FOUNDATION,** *et al.*                )
                                        )
    **Defendants.**       )
                                        )

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### PRELIMINARY STATEMENT

From February 2018 up until her unlawful termination, Dr. Terri Wright was an outstanding employee of the Eugene & Agnes F. Meyer Foundation (hereinafter the "Foundation"). She was successfully involved in many initiatives designed to help the organization advance its mission in racial equity within the housing, education and economic well-being spaces that not only garnered praise from Defendant Nicola Goren, but also members of the Foundation's Board. Despite Dr. Wright entering into a work environment where many employees of color voiced concerns to her about the hostile work environment they were being subjected to on account of their race, Dr. Wright diligently worked to ensure that she helped foster a racially equitable environment within the Foundation while successfully performing her own duties.

However, Dr. Wright's efforts to ensure a racially equitable environment within the Foundation were thwarted by Defendant Goren as she subjected Dr. Wright to disparate

1

treatment on account of her race. For example, she paper trailed Dr. Wright by raising pretextual issues regarding communication and interpersonal skills that were false. Defendant Goran chose these subjective categories to undermine Dr. Wright's position because Dr. Wright had performed outstanding work on all of her objectively measured deliverables and metrics. Sensing the absurdity of Defendant Goren's pretextual criticisms, Dr. Wright asked for more clarity on what exactly Defendant Goren meant. Defendant Goren did not provide any specific examples. Ultimately, Defendant Goren discriminatorily terminated the Plaintiff for pretextual reasons. These reasons were clearly pretextual, as Dr. Wright addressed her purported communication and interpersonal skills shortcomings by retaining a coach, having lunches with staff members, and encouraging an open-door policy with her staff.

Defendant Goren's racial animus was further exhibited in the way she treated Dr. Wright following her termination. Specifically, Defendant Goren never treated Caucasian employees of the Foundation in a disrespectful manner by talking ill of them after they left. In one specific example raised in the Complaint, Defendant Goren did not disparage Dr. Wright's predecessor who was a white male that was terminated by Ms. Goren. Instead, she referred to his termination in a way that made it seem as if there was a difference in views and strategies that led to his departure. However, with Dr. Wright, Defendant Goran disparaged the Plaintiff to Dr. Madye Henson, former CEO and President of Washington Regional Association of Grantmakers ("WRAG") by saying that Dr. Wright created a toxic culture and needed to be fired. Significantly, Defendant Goran made these disparaging remarks after she had signed a severance agreement with Dr. Wright that contained a mutual non-disparagement clause. As the Complaint alleges, Defendant Goran never violated a mutual non-disparagement clause that she entered into with a white employee of the Foundation.

2

In November 2018, a month after the Severance Agreement was executed, Defendant Goren met with Dr. Henson for a WRAG meeting and shared with Dr. Henson that she was feeling pressure on account of the fact she terminated the Plaintiff. In response, Dr. Henson shared with her the belief that many leaders in the community believe Dr. Wright's termination was racially motivated. Instead of abiding by the terms of the mutual non-disparagement clause contained in the Severance Agreement, Defendant Goren disparagingly accused Dr. Wright of creating a toxic work environment and a negative climate within the Foundation. She further stated that if she did not terminate the Plaintiff nearly two-thirds of the Foundation's staff would have left. This type of disparaging commentary was never made by Defendant Goran about any Caucasian former employees of the Foundation.

Further demonstrating the racial animus of Defendant Goran, Dr. Henson, a highly regarded African-American professional within the philanthropic community, filed a lawsuit against WRAG, Defendant Goren, and other WRAG Board Members for their unlawful discrimination against her on account of her race. In her complaint, Dr. Henson alleged a pattern of behavior where Defendant Goren hired highly qualified African-American professionals as part of her plan to show she is committed to racial equity, she paper trails them after hiring them, and ultimately terminates them for subjective, pretextual reasons despite their accomplishments. Moreover, in Dr. Henson's complaint, she documented her meeting with Defendant Goren where she defamed Dr. Wright. After reviewing this Complaint, Dr. Wright commenced the instant action.

Defendants' attempt to dismiss Plaintiff's well plead Complaint is without merit. Defendants have failed to meet their burden to dismiss Dr. Wright's causes of action for violations of 42 U.S.C. § 1981, defamation and breach of contract.

3

## FACTS ALLEGED IN THE COMPLAINT

For the purposes of deciding a FRCP 12(b)(6) motion, the following factual allegations must be taken as true and all reasonable inferences must be drawn in the Plaintiff's favor. Sandvig v. Sessions, 315 F.Supp.3d 1 (D.D.C. 2018):

Dr. Wright's professional career has been dedicated to advancing racial and social equity within historically challenged areas such as housing, education, economic well-being and public health. (Exhibit 1, Verified Complaint at ¶ 10). In her pursuit of addressing these glaring inequities plaguing low-income communities of color, Dr. Wright has held different leadership positions at various governmental, private and public institutions such as American Public Health Association ("APHA), W.K. Kellogg Foundation, Michigan Department of Public Health and the Georgia Department of Health and Human Services. (Id.). In each of these positions, Dr. Wright spearheaded various initiatives geared toward identifying multiple forms of racism and offering ways to address them. (Id. at ¶ 11).

To this end, Dr. Wright was eager to pursue a new opportunity as Vice President for Program and Community at the Meyer Foundation, which according to its stated mission and history, advanced the causes that Dr. Wright highly regarded such as racial equity in housing, education and economic well-being. (Id. at ¶ 12).

Defendant Goren hired Dr. Wright to lead the Foundation in a new strategic direction as part of its plan to improve grantmaking strategy by favoring grantees committed to taking on a more active role of advocacy in pursuit of racial equity within their communities. (Id. at ¶ 13). After undergoing five rounds of interviews with various Board Members, Foundation members, and Defendant Goren, Dr. Wright was hired in February 2018. (Id. at ¶ 14).

4

When Dr. Wright came on board, she learned that she was hired to replace Rick Moyers, a Caucasian male, who previously held the title of Vice President of Program and Communications. (Id. at ¶ 15). In light of the Foundation's new direction, Mr. Moyers' previously held position was changed to reflect Dr. Wright's title at the time of her hire. (Id.). In addition, Defendant Goren shared with Dr. Wright the circumstances behind Mr. Moyers' departure and the events leading up to the decision to terminate him. (Id. at ¶ 16). Defendant Goren did not say anything disparaging about Mr. Moyers and made it appear as if his departure was just a disagreement over their respective visions for the Foundation. (Id.). Defendant Goren was amiable regarding Mr. Moyers' termination. (Id.). Defendant Goren allowed him to leave on his own terms, which did not adversely affect his reputation within the philanthropic community. (Id.). This was not the treatment Dr. Wright received by Defendant Goren following her termination. (Id.).

In her role as Vice President of Program and Community, Dr. Wright was responsible for overseeing the Foundation's programs and community engagement efforts, which included the implementation and integration of the Foundation's key strategies of grant making, capacity building, collective action and advocacy across the region, which included the District of Columbia, Maryland, and Northern Virginia. (Id. at ¶ 17).

As soon as Dr. Wright came on board, staff members confided in her the hardships that occurred under Defendant Goren's leadership which heightened during the Summer of 2017 and continued thereafter. (Id. at ¶ 18). During the Summer of 2017, many of the staff reported they went through "painful" and uncomfortable discussions relating to racial equity within the Foundation that were led by Defendant Goren. (Id.). Many of the participants felt that the concerns raised in these discussions fell on deaf ears as no meaningful change was implemented

to address their shared complaints. (Id.). In fact, an African-American staff member described these discussions as mere "talk" under the guise of making it appear as if the Foundation cared. (Id.).

Aisha Alexander-Young was hired as the Senior Director of Strategy and Racial Equity in June 2018 to implement racial equity within the organization. (Id. at ¶ 19). One of her first initiatives was to launch an internal survey amongst employees. The results of the survey reflected that employees of color within the organization felt uncomfortable and believed their race negatively impacted their work environment. (Id.). The survey feedback further documented a lack of trust in the Foundation's leadership and management, and despite the survey results, no meaningful action was taken to address these glaring issues. (Id.).

In October 2018, one of the Foundation's African-American Program Assistants left the organization feeling as if she was set up for failure on account of her race. (Id. at ¶ 20). Upon Dr. Wright's hiring, Defendant Goren warned the Plaintiff that this employee may not be "well-suited" for the job and Dr. Wright was responsible for determining how she would manage the African-American Program Assistant. (Id.). When Dr. Wright met with this Program Assistant and assured her that she would work with her in keeping her job, the employee still did not feel comfortable and left the Foundation. (Id.). She complained to Dr. Wright that she felt as if she was being forced out because of her race and expressed her belief that Dr. Wright did not have the authority to override the pervasive discrimination she was forced to endure. (Id.).

During her tenure, Dr. Wright addressed staff members' complaints about the hostile work environment they were subjected to on account of their race, a toxic environment that she did not create. (Id. at ¶ 21). Dr. Wright excelled in her new role, and she worked with staff to improve performance and to foster a racially equitable work environment. (Id.).

As part of Dr. Wright's efforts to advance racial equity within the region, she developed a framework facilitating the Foundation's transition of removing direct service grants and grantees from the Foundation's portfolio to allow for grantmaking aimed at combating systemic racism. (Id. at ¶ 22). Her framework garnered Board support and funding. (Id.). Moreover, in furthering the Foundation's vision, Dr. Wright established a mechanism to collect demographic data from prospective grantees to ensure the Foundation was working with minority owned and/or directed organizations. (Id.).

In addition, during Dr. Wright's first year and a half she spearheaded significant initiatives, which included: positioning the Foundation to take the lead in developing a regional strategy amongst philanthropic organizations for the 2020 Census; participation and promoting the "Get out the Vote" campaign both internally and externally; leading the philanthropic response to the 2018-2019 Federal Government shutdown by expediting grants to nonprofit organizations that provided directed services to those economically impacted by the government shutdown; redesigning the Board's system in approving prospective grantees by focusing on strategy not tactics; revamping the Program Associate Position; and leading developmental work for new youth engagement focused on cultivating a new generation of leaders. (Id. at ¶ 23). At the end of 2018, Dr. Wright received a performance evaluation and a raise by Defendant Goren despite not working at the Foundation for a year. (Id. at ¶ 24).

Despite her accomplishments and accolades during Dr. Wright's first year with the Foundation, Defendant Goren began to paper trail Dr. Wright in the feedback she provided in Dr. Wright's 2018 Year End Evaluation. Defendant Goren could not criticize Dr. Wright for her objective performance and deliverables, but instead Defendant Goren raised subjective and false criticism against Dr. Wright aimed at interpersonal skills and communication issues that no one

7

in the organization had raised previously.  (Id. at ¶ 25). The positive feedback Defendant Goren gave to Dr. Wright included praising her for a "strong year," acknowledgment that she "contributed to the advancement of [the Foundation's] mission, vision goals," and "[a]s far as contributions and deliverables Terri hit the ground running as VP and has been highly productive." (Id.).  Defendant Goren further lauded Dr. Wright by stating, "I appreciate having a partner who is on the same page in terms of the vision for our direction and our work, with a strong point of view in how to execute against that mission," and that Dr. Wright "[d]eveloped and presented a cohesive request and plan for respectfully transitioning organizations that do not fit in the new strategy, which resulted in the Board unanimously approving efforts to increase the grant target over two years and accommodate the transition."  (Id.).  As such, Dr. Wright was bewildered by the criticism aimed at her interpersonal skills and communication as she never received such feedback from prior employees, colleagues or direct reports. (Id. at ¶ 26).  When the Plaintiff asked Defendant Goren to provide greater detail, she merely brushed her off and told her that Dr. Wright was "too busy in the weeds," which was a pretext to mask her discriminatory animus against the Plaintiff. (Id. at ¶ 26).  In fact, Dr. Wright's 2019 Work Plan which was endorsed by Defendant Goren acknowledged there were areas within her assigned territory that required her own deeper engagement and a long-term substantive commitment to "lay the pathway for transformation." (Id. at ¶ 26).  As such, this level of engagement by Dr. Wright was required for her to succeed in her role and ultimately acknowledged by Defendant Goren.  (Id.).

In light of this feedback, at the direction of Defendant Goren, Dr. Wright began having lunches with staff to increase her face time with them on a personal basis rather than working lunches and even engaged a professional coach to assist her in this purported need for development as identified by Defendant Goren. (Id. at ¶ 27).  Notably, as Dr. Wright encouraged

8

an open-door policy with her team, whenever she met with her staff they appeared comfortable discussing all facets of their work experience and did not offer Dr. Wright any areas of concern regarding her leadership.  (Id.).

In light of the work she was doing to address these pretextual areas of concern identified by Defendant Goren, the Plaintiff was encouraged when receiving feedback for January 2019 to April 30, 2019, in which Defendant Goren wrote that it "appears Terri has been working on her communication and relationship with her team and that things feel less charged than at the end of last year."  (Id. at ¶ 28).

During the June 2019 Board Meeting, Dr. Wright presented her 2020 Census Plan identifying the significance of encouraging participation in the 2020 Census and identifying approaches that would allow the Meyer Foundation to be the leader on this front well as her plan for redesigning the grant making process.  (Id. at ¶ 29).  Both initiatives were approved and received great praise by the Board.  (Id.).  After receiving Board approval during the June 2019 meeting, Dr. Wright dedicated her time to implementing the grant making process redesign with her team and continued her duties without any criticism or concern raised by her direct reports or Defendant Goren.  (Id. at ¶ 30).

Without any notice, warnings or an opportunity to have any discussions regarding her termination, Defendant Goren abruptly terminated Dr. Wright pre-textually claiming that she was fired because of her purported ongoing interpersonal and communication issues.  (Id. at ¶ 31).  This is something that she didn't do with her Caucasian staff members.  (Id.).  Further evidencing Defendant Goren's discriminatory set up of Dr. Wright, Defendant Goren continuously undermined Dr. Wright's authority with her team despite Dr. Wright's repeated complaints.  (Id. at ¶ 32).  Specifically, Defendant Goren encouraged Dr. Wright's team to visit

9

with her to discuss their roles, assignments and team dynamic, and when Dr. Wright requested to be involved in these discussions, Defendant Goren dismissed her requests. (Id.).

In October 2019, Dr. Wright, seeking to avoid litigation over potential claims against Defendant Goren and the Meyer Foundation regarding her termination, negotiated and entered into a contract labelled as a severance agreement. (Id. at ¶ 33). Critically important to Dr. Wright as part of the negotiations was a mutual non-disparagement clause due to her concerns regarding the pretextual false and subjective statements that Defendant Goren made about Dr. Wright's interpersonal skills. (Id.). Eventually, Dr. Wright was able to enter into an acceptable agreement with the Meyer Foundation and Defendant Goren. (Id.).

The Agreement contained a Mutual Non-Disparagement Clause, which sets forth:

"You agree that you have not made and will not make, any false, disparaging or derogatory statements to any person or entity, including any media outlet, industry group or financial institution, regarding the Foundation or any of the releases, or about the Foundation's business affairs and/or financial conditions; provided, however, that nothing herein prevents you from making truthful disclosures to any governmental entity or in any litigation or arbitration. Likewise, the Foundation will direct those officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding you."

(Id. at ¶ 34). Despite this clause, the month following the parties' execution of the severance agreement, in or around early November 2019, Defendant Goren met with Dr. Madye Henson, former President and CEO of Washington Regional Association of Grantmakers ("WRAG") in her capacity as WRAG's Chair of the Board of Directors. (Id. at ¶ 35). During Defendant Goren's offsite meeting with Dr. Henson, Defendant Goren complained that she was feeling the backlash from abruptly terminating Dr. Wright. (Id. at ¶ 36). In response to Defendant Goren, Dr. Henson shared that many leaders in the community are questioning her decision and believe that Defendant Goren's termination of Dr. Wright was discriminatorily motivated. (Id.).

Defendant Goren acknowledged that she sensed this may be the perception and claimed

10

that she had no option.  She then disparaged and defamed Dr. Wright by falsely stating Dr.

Wright was "toxic" and she fostered "a negative climate" within the Foundation and had to be

fired or two-thirds of the staff would leave.  (Id. at ¶ 37).

## THE CAUSES OF ACTION AGAINST THE DEFENDANTS

### First Cause of Action: Race Discrimination in Violation of 42 U.S.C. §1981 as to all Defendants

For this Cause of Action, Dr. Wright alleges that the Defendants treated her in a manner

unequal to other employees as they discriminatorily denied Plaintiff unequal treatment on the

basis of her race in violation of 42 U.S.C. § 1981 in the terms, conditions, privileges and

enforcement of her Severance Contract that was entered into for that purpose.  (Id. at ¶ 39).  Dr.

Wright further alleges that on account of the Defendants' failure to remedy the treatment to

which she was subjected despite their knowledge, they denied Dr. Wright equal treatment on the

basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions, privileges and

enforcement of her Severance Contract.  (Id. at ¶ 40).  Specifically, the Plaintiff was disparaged

in violation of the terms of the Agreement due to the Defendants' racial animus against African-

Americans in violation of 42 U.S.C. § 1981.  The result of this violation has caused the Plaintiff

to experience severe economic loss, reputational harm, emotional distress and depression.  (Id.).

The Defendants' discriminatory acts show the intentional and racially motivated decision of

Defendants to violate the terms and conditions of the Severance Agreement.  (Id. at ¶ 41).

Defendants have not engaged in similar conduct related to non-African-American employees.

(Id.).  As a result of the Defendants' conduct, Dr. Wright has suffered and will continue to suffer

past and future economic, physical, reputational and emotional harm.  (Id. at ¶ 42).  Thus,

Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief. (Id. at 43).

### Second Cause of Action: Defamation as against Defendant Goren

Here, Dr. Wright alleges that after the parties entered into a Severance Agreement, Defendant Goren falsely told Dr. Henson, a non-party to the Agreement, that Dr. Wright was "toxic" and created a "negative climate" at the Foundation during a business meeting involving WRAG. (Id. at ¶ 45). Defendant Goren's statement that Dr. Wright was "toxic" and created a "negative climate" within the Meyer Foundation is false and unsupported by any feedback the Plaintiff received during her tenure, not only by staff, but by Defendant Goren herself. (Id. at ¶ 46). In fact, Defendant Goren made these false statements to mask her discriminatory decision to terminate Dr. Wright after many in the philanthropic sector began questioning her discriminatory animus. (Id.). As a result of Defendant Goren's defamatory statement, the Plaintiff has suffered financial and reputational harm into the foreseeable future. (Id. at ¶ 47).

### Third Cause of Action: Breach of Contract

For this cause of action, Dr. Wright alleges that the parties entered into a Severance Agreement that explicitly provided that the Foundation "will direct those officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity" regarding Plaintiff. (Id. at ¶ 49). Defendant Goren signed this Agreement and was aware of this material term. (Id.). Despite this mutually agreed upon and material provision in the Agreement, the Defendants unequivocally breached the terms of the Agreement when Defendant Goren falsely told Dr. Henson that she had no choice but to terminate Dr. Wright because she was "toxic" and created a "negative

12

environment." (Id. at ¶ 50). As a result of the Defendants' breach of Agreement, the Plaintiff suffered significant economic, reputational and emotional harm. (Id. at ¶ 51).

## HENSON AMENDED COMPLAINT

In support of the Defendants' Motion to Dismiss, they annexed a copy of Dr. Madye Henson's Complaint. (Exhibit 2). Dr. Henson commenced a lawsuit against Defendant Goren, WRAG, and other individually-named Defendants for discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1981, and the District of Columbia Rights Act ("DCHRA"), DC Code §2-1401.01 et seq. In respect to her allegations regarding Dr. Wright and her related experiences with Defendant Goren, Dr. Henson alleges as follows in her Amended Verified Complaint:

"Defendant Goren as CEO of the Eugene & Agnes E. Meyer Foundation ("Meyer Foundation"), has a history of dismissing leaders of color, including Dr. Terri Wright, a well-known African-American woman and revered leader in charitable giving who was hired as the Meyer Foundation's Vice President of Programming and Community. Dr. Wright was hired in February 2018, but before joining the Meyer Foundation, she had been the first Executive Director of the Steve Fund which was charged with advancing the mental health and emotional well-being of college and university students of color, she was the director of Centers for Public Health Policy and School, Health and Education at the American Public Health Association and spent 12 years as the Director for Director for Health Policy at the Kellogg Foundation. Despite her obvious talent and skill, Defendant Goren unceremoniously fired Dr. Wright a year later, thereby tarnishing Dr. Wright's stellar reputation and undermining the years of work that she put in to establishing herself as a leading voice in this industry."

(Id. at Preliminary Statement).

"Next, when Dr. Henson discussed Defendant Goren's firing of Dr. Wright from the Meyer Foundation and told her that it had sent shock waves through the industry and raised issues of discriminatory conduct, Defendant Goren simply said that Dr. Wright was harmful to the Meyer Foundation because she created a "negative climate" and therefore she had to go. Dr. Henson saw this statement and action by Defendant Goren as being the stereotypical justification for people who discriminate in employment decisions based on race: nothing specific, articulable or objective."

(Id.).

13

"In November 2019, Dr. Henson met with Defendant Goren for an offsite one-on-one meeting to discuss various WRAG related matters. During this meeting, Defendant Goren mentioned that she was feeling backlash on account of her role in abruptly terminating Dr. Terri Wright, a senior level African-American executive, from her organization, the Meyer Foundation. In response, Dr. Henson shared with Defendant Goren that the circumstances surrounding Dr. Wright's termination are being questioned by leaders in the community as many believe the termination was discriminatorily motivated. In response, Defendant Goren acknowledged that she sensed this may have been the perception, but she had no option because of the "negative climate" Dr. Wright was fostering. Dr. Henson saw this as a stereotypical, pretextual reason for an illegal firing: no objective reasons, simply a personality conflict. Not surprisingly, these claims of creating a "negative climate" were similarly used by Defendant Goren against Dr. Henson as a pretext to support her unlawful termination."

(Id. at ¶ 48).

"Soon after reprimanding Ms. Cook and Ms. Greiner-Lott for their ongoing discriminatory behavior toward Ms. Rodriguez and other employees of color, Defendant Goren began retaliating against her for disciplining Caucasian employees. She began accusing Dr. Henson of creating a toxic work environment and a "negative climate," similar to the pretextual claims she made against Dr. Wright. In contrast, when Dr. Henson made personnel decisions with respect to her employees of color no action was taken by Defendant Goren or the Board."

(Id. at ¶ 52).

"Since Dr. Henson's unlawful termination, the Race, Equity and Future of Greater Washington Summit has proceeded as Dr. Henson as planned without any significant changes. Dr. Henson dedicated tireless hours working with dedicated Partners to ensure that the effort was successful. As a result of her hard work, the first part of the Summit series was held on June 11, 2020 and had over 500 hundred participants that joined the virtual meeting. It is clear that Defendant Goren did not want her to continue in a leadership role and receive any of the recognition for Dr. Henson's efforts. Instead of support Dr. Henson's leadership in this effort, the Board used every opportunity to mask its discriminatory and retaliatory decision to terminate Dr. Henson while trying to make it appear that the WRAG Board and organization is committed to Racial Equity. This was a clear attempt by Defendant Goren to try and repair the damage that has been done to her reputation after she terminated Dr. Henson, and Dr. Wright who was another well-respected African-American leader in this sector and the second such African-American female in less than a year."

(Id. at ¶ 76). It must also be noted that no where in Exhibit 2 did Dr. Henson allege that she was

involved in the operations and management of the Foundation, had any involvement with Dr.

Wright and her employment at the Foundation during the relevant time frame, and had any

common interest with the Foundation and Defendant Goren in her capacity as President and Chief Executive Officer of the Foundation.

## LEGAL ARGUMENT

## I.     DEFENDANTS FAILED TO MEET THE STANDARD FOR DISMISSAL PURSUANT TO FRCP 12(b)(6).

### A. Standard for Dismissal Pursuant to FRCP 12(b)(6)

In order to defeat a Rule 12(b)(6) motion, a Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 550.

When analyzing a 12(b)(6) motion to dismiss, the Court must construe the complaint "liberally in the plaintiff's favor," and "accept as true all of the factual allegations" alleged in the Complaint. Redding v. Edwards, 569 F.Supp.2d 129, 131 (D.D.C. 2008). Thus, a Court may not dismiss a case if the pleadings suggest a plausible scenario in which the pleader is entitled to recover. Morris v. Carter Global Lee, Inc., 997 F.Supp.2d 27, 38 (D.D.C. 2013).

When reading the Plaintiff's Verified Complaint in the light most favorable to the Plaintiff, accepting each allegation as true and drawing all reasonable inferences in Plaintiff's favor, Defendants' Motion to Dismiss must be denied in its entirety.

### B. Plaintiff Sufficiently Pled a Claim of Race Discrimination Pursuant to 42 U.S.C. § 1981.

The protections of 42 U.S.C. §1981, which provides that all persons "have the same right … to make and enforce contracts… as if enjoyed by white citizens" extends to employment

contracts.  See Morris v. Carter Global Lee, Inc., 997 F.Supp.2d 27 (D.D.C. 2013).  As such, the Complaint alleges that: (1) Dr. Wright is a member of a racial minority group, (2) the Defendants intentionally discriminated against her on the basis of her race, and (3) the discrimination concerned the equal enjoyment of benefits, privileges, terms and conditions of a contractual relationship guaranteed under 42 U.S.C. § 1981.  Marshall v. Honeywell Technology Solutions, Inc., 536 F.Supp.2d 58, 68-69 (D.D.C. 2008).

At the outset, the Defendants do not dispute that Plaintiff is a member of a protected category, but instead argue that she did not sufficiently plead facts to show that she was discriminated against in violation of 42 U.S.C. § 1981.  Their argument is without any merit. The Plaintiff alleges in her Complaint that the Defendants discriminated against her because she is African-American by intentionally violating the terms and conditions of her Severance Agreement and that unlike non-African American former employees of the Foundation, she was singled out because of her race, and disparaged.  Specifically, Plaintiff alleged that her predecessor, a Caucasian male, Rick Moyers, was not disparaged by Defendant Goren after his termination, attributed Mr. Moyers' termination to being over a difference in vision, did not raise any concerns regarding to his performance, and she allowed him to leave the Foundation on his own terms as to not adversely affect his reputation.  Plaintiff likewise alleged that no non-African American employee that was given a severance agreement containing a mutual non-disparagement clause was subsequently disparaged by the Defendants.  This treatment was not afforded to the Plaintiff despite her stellar performance.  Instead, the Plaintiff was abruptly terminated after being discriminatorily paper trailed by Defendant Goren as a pretext to mask Defendant Goren's discriminatory animus against the Plaintiff on account of her race.

Moreover, Defendant Goren subsequently disparaged the Plaintiff after entering into a

16

Severance Agreement with the Foundation which is something that the Foundation and Goren have never done to Caucasian employees.   Thus, the Plaintiff made out a prima facie claim for relief under 42 U.S.C. § 1981.   Nanko Shipping, Guinea v. Alcoa, Inc., 330 F. Supp. 3d 439, 449 (DCDC 2018) (Collyer, J) (Complaint sufficiently alleged prima facie case of 1981 discrimination where company treated Black owned companies less favorably than white owned companies under the same shipping rights provision).

### 1. Plaintiff is Not Barred From Recovering For Reputational Harm

Defendants further argue that the Plaintiff is not entitled to recover for damages related to the reputational harm she suffered pursuant to 42 U.S.C. § 1981.   In support of Defendants' argument, they rely on Teltschik v. Williams & Jensen, PLLC, 2012 WL 3960606 (D.D.C. Sept. 10, 2012) and Jorgensen v. Mass. Port Auth., 905 F.2d 515, 520 (1st Cir. 1990), two factually dissimilar cases.   In Teltschik, the Court held that Plaintiff's negligence and breach of fiduciary duty claims are subsumed by his defamation claim, which was previously dismissed by the Court.   Similarly, in Jorgensen, the Court held that losses for harm to one's reputation is not a recoverable element in an ordinary negligence claim.   Unlike the Plaintiffs in Teltschik and Jorgensen, Dr. Wright has a clear remedy available to recover for reputational harm on account of Defendants' intentional discriminatory conduct under 42 U.S.C. § 1981.

Compensatory damages are an available remedy available to a Plaintiff who suffered discriminatory conduct in violation of 42 U.S.C. § 1981.   Saad v. Burns Intern. Sec. Services, Inc., 456 F. Supp. 33, 37 (D.D.C. 1978) citing to Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 460 (1975).   It has been established that compensatory damages allow a Plaintiff to recover for intangible compensatory damages, including reputational harm. Dickerson v. District of Columbia, 2019 WL 6910043, * 3 (D.D.C. Dec. 19, 2019).

As such, Plaintiff is not precluded from recovering for reputational harm pursuant to 42 U.S.C. § 1981.

### C. Plaintiff Sufficiently Pled a Defamation Claim Against Defendant Goren

In support of her claims for defamation, the Plaintiff has sufficiently pled (1) Defendant Goren made a false and defamatory statement by stating that she created a toxic environment, fostered a negative climate within the Foundation, and if she was not terminated than two-thirds of the staff would have left; (2) Defendant Goren published the statement without any privilege to a Dr. Henson, a third party; (3) Defendant Goren's fault in publishing these statements to Dr. Henson amounted to at least negligence as she was intentionally seeking to mask the discriminatory reasons behind her termination of the Plaintiff; and (4) either the statement was actionable as a matter of law irrespective of special harm or that its publication caused Dr. Wright to suffer special harm. Carter v. Hahn, 821 A.2d 890, 893 (D.C. 2003).

In evaluating a defamation claim, a publication is deemed defamatory if it tends to injure a Plaintiff in his or her trade, profession or community standing or lower him or her in the estimation of the community. Olinger v. American Sav. & Loan Ass'n, 409 F.2d 142, 144 (D.C. 1969). Such a statement is meant to be more than unpleasant or offensive, but odious, infamous or ridiculous. Id. In order to survive a Rule 12(b)(6) motion to dismiss, the contested statements must be both verifiable and reasonably capable of having defamatory meaning. Weyrich v. New Republic, Inc., 235 F.3d 617, 623-624 (D.D.C. 2001). Statements of opinion can be actionable if they imply a provably false fact or rely upon facts that are provably false. Id. Ultimately, a Court's power to find that a statement is not defamatory as a matter of law is limited if it appears that the statements are at least capable of a defamatory meaning, then whether they are defamatory and false are issues to be decided by a jury. Moss v. Stockard, et al., 580 A.2d 1011,

18

1023-1025 (D.C. 1990).

The Complaint alleges that Defendant Goren falsely told Dr. Henson that the Plaintiff created a toxic work environment, fostered a negative climate, and that if she did not terminate her than two-thirds of the Foundation staff would have left. These statements were intended to injure Dr. Wright's standing within the philanthropic community to make her appear unprofessional and someone who would foster tumult in any organization to mask Defendant Goren's discriminatory reasons for terminating her. Moreover, as set forth in the Complaint, Defendant Goren's feedback of Dr. Wright during her tenure at the Foundation did not represent that she was creating a "toxic" or "negative" work environment jeopardizing the Foundation's morale. Rather the Complaint alleges that any negative feedback given by Defendant Goren was pretextual and meant to cover her discriminatory animus. Further, the Complaint alleges that when Plaintiff sought further clarity from Defendant Goren, she could not provide any examples. In addition, Dr. Wright's direct feedback from staff did not indicate any that two-thirds of the staff would leave or that any employee felt a toxic environment that was created by her. Accordingly, the Plaintiff sufficiently pled that Defendant Goren's statements are provably false. At a minimum, because the Complaint can reasonably be read to indicate that Defendant Goren failed to "make a reasonable investigation as to the truth" concerning Dr. Wright's performance because the reasons for her termination were rooted in unlawful ones, then she has made out a prima facie case of defamation. Nyambal v. Alliedbarton Security Services, Inc., 344 F.Supp. 3d 183, 190 (D.D.C. 2018).

19

### 1. Defendant Goren and Dr. Henson do not have a Common Interest Allowing Defendant Goren to Invoke the Common Interest Privilege.

The Defendants' argument on this point is completely without merit or foundation. Specifically, by choosing to move to dismiss the Complaint, the Defendants are limited to the factual allegations made in the Complaint and those documents that are referenced in the Complaint. Here, the Defendants in neither the Wright complaint or the Henson complaint which was referred to in the Wright Complaint allege facts that establish a common interest privilege between Dr. Henson and Defendant Goren. Specifically, in order to invoke the common interest privilege, Defendants must prove that the statement in question is protected: (1) was made in good faith; (2) on a subject in which the party communicating has an interest, a belief that she had a duty to the person with a corresponding interest; (3) to a person with a corresponding interest or duty. Payne v. Clark, et al., 25 A.3d 918, 925 (D.C. 2011). None of those facts are established by the Complaints that are part of this motion. The Complaints both allege that Defendant Goren's statement about Dr. Wright were done to cover her racial animus and not made in good faith. Similarly, nothing in the Complaints allege that Dr. Henson had an interest in the subject or a belief that she had a duty to Defendant Goren. Further, nothing in the Complaints allege that Defendant Goren had a corresponding interest or duty in the subject matter. Thus, at this stage of the proceeding, the inferences that Defendants want this Court to jump through hoops to find are unavailing.

Assuming, *arguendo*, that somehow the inferences will be drawn against the Plaintiff at this stage of the proceeding, the defendant's arguments will still fail. Specifically, assertion of the common interest privilege is foreclosed if there is excessive publication, publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest' and/or the publication was made with malice or bad

faith. Armenian Assembly of American, Inc. v. Catesjian, 597 F. Supp.2d 128 (D.D. C. 2009). As mentioned, the Complaints allege that Defendant Goren made her statements in bad faith as she tried to cover up her own racial animus in firing Dr. Wright and therefore are not protected by privilege. See Caudle v. Thomason, 942 F.Supp. 635 (D.D.C. 1996); see also, Moss v. Stockard, et al., 580 A.2d 1011, 1023-1025 (D.C. 1990).

Defendants argue that Defendant Goren in her capacity as the Chair of WRAG and Dr. Henson, former President and CEO of WRAG, were colleagues and had a common interest in how Defendant Goren's reputation would be perceived by community leaders after she terminated Dr. Wright in her capacity as President and CEO of the Meyer Foundation, a different organization is nowhere alleged in either Complaint. Defendants' attempt to recast the Plaintiff's allegations fails because Defendant Goren, when discussing WRAG related business, brought up on her own accord the pressure she was facing after terminating Dr. Wright. This discussion was a departure from their scheduled WRAG offsite meeting.

For these reasons Defendants reliance on Preston v. Land, 255 S.E.2d 509 (Va. 1979) and Wood v. Am. Fed'n of Gov't Employees, 316 F. Supp. 3d 475 (D.D.C. 2018)  are inapposite.

Based on the foregoing, Defendant Goren is unable to invoke the common interest doctrine.

### 2.  *Plaintiff Sufficiently Established She Suffered Harm on Account of Defendant Goren's Defamatory Statements.*

As for the fourth element, Dr. Wright sufficiently pled that the defamatory statements made by Defendant Goren is actionable irrespective of special harm on account of the fact that Defendant Goren's defamation would affect the perception of Plaintiff's professionalism. See Nyambal v. Alliedbarton Security Services, Inc., 344 F.Supp.3d 183, 192 (D.D.C. 2018) ("One

who publishes a slander that… would adversely affect [a plaintiff's] fitness for the proper conduct of his lawful business, trade or profession … is subject to liability without proof of special harm."). As a result of this defamation, the Plaintiff alleged in her Complaint that due to Defendant Goren's statements, she suffered reputational harm and economic damages.

### D. Plaintiff Sufficiently Pled that Defendant Goren was a Party to the Agreement and That Defendants Breached it.

In her Complaint, the Plaintiff alleged that Defendant Goren was a signatory to the Agreement, a fact that is not contested by the Defendants. Moreover, the letter agreement itself (annexed as Exhibit 1 to Defendants' Motion), which was addressed solely to Dr. Wright, was drafted by Defendant Goren for the Foundation and she was the sole signatory on behalf of herself and the Foundation. From the letter, it is clear that Defendant Goren drafted it as she sent it to Dr. Wright specifically to address issues raised by Dr. Wright. The letter agreement that Defendant Goren wrote clearly stated that it contained a "Mutual Non-Disparagement Clause" something the Complaint in this case alleged was an important consideration for the Plaintiff. The "Mutual Non-Disparagement" clause by its plain meaning applied equally to Defendants and Plaintiff.

Since the Foundation itself could not disparage Plaintiff, since it is an inanimate object, the Foundation instead would be liable for a breach of the agreement if one of the enumerated people who worked for the Foundation were informed about the need to refrain from making disparaging comments about Plaintiff and then made such disparaging comments. Likewise, individuals who were told about the need for non-disparagement against the Plaintiff could be held responsible for breaching the mutual non-disparagement clause in the event that they did. Under the Agreement, the Plaintiff likewise could not make disparaging comments about Defendants. Since Goren was the President and CEO of the Foundation and the drafter of the

22

letter agreement containing the mutual non-disparagement clause, she knew about the Agreement and therefore could be held accountable for making disparaging statements against the Plaintiff to any person. Her disparaging statements about Plaintiff are therefore actionable as a Breach of that Agreement by both her and the Foundation.

Defendants' argument that the plain meaning of "Mutual Non-Disparagement" really means it was a one-sided term applying only against the Plaintiff is unavailing. Specifically, Defendants suggest that the agreement only required Defendant Goren and the Foundation to "direct those officers, directors, and employees with direct knowledge of this revised letter agreement not to make any false, disparaging, or derogatory statements to any person." Their argument follows that once the warnings are given, then somehow they were shielded from any claim that they breached the mutual non-disparagement clause. This tortured argument makes no sense and is contrary to the law.

The Mutual Non-Disparagement language as it applies to the Defendants in the agreement is a condition that they signed. There is no other language in the Agreement that limits the mutuality of the non-disparagement clause or shields the Defendants from violating it. Moreover, to the extent that the Defendants may argue that the Mutual Non-Disparagement language is just a meaningless heading in the Agreement is without merit since the agreement itself does not give the language such a limiting function. Thus, at best, what Defendants have raised is potential ambiguity in the language but only if the Mutual Non-Disparagement provision is read as being defined by the subsequent language which as stated the plain language of the Agreement poses no such limitation. Instead, the two terms must be read as standalone requirements: 1) that the Defendants will not disparage the Plaintiff; and 2) that they will notify those who are aware of the agreement not to disparage the Plaintiff. A failure to do either will

23

constitute a breach of the Agreement.  Since Defendants are the drafters of the Agreement, then any ambiguity in the reading of the agreement must be read in favor of the non-drafting party. See Sagalyn v. Foundation for Preservation of Historic Georgetown, 691 A.2d 107 (DCCA 1997).  It would otherwise be unconscionable that Defendant Goren who is an author of, signatory to and who bound the Foundation to the Mutual Non-Disparagement clause, could then be allowed to disparage Plaintiff as long as  people from the Foundation who knew about the agreement  were given proper notice.

The cases cited to by the Defendants are inapposite.  For example, in Jones v. Quintana, 872 F. Supp.2d 279 (D.D.C. 2012), the Settlement Agreement in question was entered into by the National Association of Government Employees on Plaintiff's behalf after the Association initiated a grievance on behalf of the Plaintiff.  The Agreement identified parties, but did not include the Plaintiff as one, and she only signed to identify herself as the grievant.  Accordingly, the Court found that because the Agreement defined the parties excluding the Plaintiff, it was clear that Plaintiff was not a party to the Agreement.  Unlike in Jones , Defendant Goren was involved in the drafting of the Agreement, was a signatory of the Agreement, was aware of the mutual non-disparagement clause and that it applied to her in her capacity as an individual with knowledge of the letter agreement, and still violated the terms of the Agreement by disparaging Dr. Wright to Dr. Henson.  Moreover, in Guttenberg v. Emery, 41 Supp.3d 61, the Court held that a spouse of a one of the parties of the Agreement was not bound by the terms of the Agreement because she was neither a signatory or a party to the Agreement in question, unlike Defendant Goren in the instant Agreement.

In short, the Plaintiff established a valid contract between the parties, the Defendants had a duty or obligation arising out of the contract, the Defendants breached the duty and as a result

the Plaintiff suffered damages.  <u>Friends Christian High School v. Geneva Financial Consultants,</u> <u>et al.</u>, 39 F.Supp.3d 58, 61-62 (D.D.C. 2014).

In support of Plaintiff's claim for breach of contract, she alleged that although the parties entered into an Agreement in which Defendant Goren was a signatory that directed "officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person entity," Defendants breached the Agreement on account of Defendant Goren's false statement to Dr. Henson.  As a result, the Plaintiff suffered economic, reputational and emotional harm.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety as set forth in Plaintiff's Proposed Order.

Dated:  New York, New York
         September 24, 2020

Respectfully Submitted,

THE COCHRAN FIRM
Attorneys for Plaintiff

/s/ Tracey L. Brown
Tracey L. Brown, Esq. (DC Bar No. 450898)
Derek S. Sells, Esq. (DC Bar No. 420398-
Admission Pending in this Court)

55 Broadway, 23rd Floor
New York, NY 10006
Tel No.:  (212) 553-9215
Fax No.: (212) 227-8763
tbrown@cochranfirm.com
dsells@cochranfirm.com

25