**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TERRI D. WRIGHT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:20-cv-02471-KBJ** |
| ) | |
| **EUGENE & AGNES E. MEYER** ) | |
| **FOUNDATION**, *et al.* ) | |
| ) | |
| **Defendants.** ) | |

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

--------------------------------------------------------------X

MADYE HENSON,

                        Plaintiff,

      -against-                             **VERIFEID**
                                           **<u>AMENDED COMPLAINT</u>**

WASHINGTON REGIONAL ASSOCIATION OF
GRANTMAKERS, NICOLA O. GOREN,
KELLY LYNCH,   HANH LE, and              Civil Action No.
GRETCHEN GREINER-LOTT,               1:20-cv-02043-DLF

                                                 **Jury Trial Demanded**

                        Defendants.

--------------------------------------------------------------X

       Plaintiff MADYE HENSON, by and through her counsel, THE COCHRAN FIRM, as

and for her Verified Complaint against Defendants, respectfully sets forth and alleges:

**<u>STATEMENT</u>**

       The Washington Regional Association of Grantmaker's (WRAG), known nationally for

the training and engagement it has done externally to challenge and address systemic racism in

philanthropy, has done little to address its own internal race issues.  The gaps and inequities in

philanthropy have been noted by many in and out of the sector, including, former WRAG

President, Tamara Copeland, who remarked about the state of philanthropy and the need for the

training series, *Putting Racism on the Table*, as philanthropic members "at no time in their

professional lives or academic training… sought to learn deeply or been taught about race and

racism."  She further described contributions that were had with members about racism and the

overlay of race as "treacherous."  While WRAG pressed forward with challenging members to

put a racial equity lens on their work, the challenge was not operationalized by the Board or

within the organization itself.

The leading voice of WRAG is Defendant Nicola O. Goren, the Caucasian chairwoman of the Board of Directors.  She is also the President and CEO of the Eugene and Agnes E. Meyer Foundation, which claims to be a charitable giving organization and one of the largest contributors to the Association. Defendant Goren, as CEO of the Eugene & Agnes E. Meyer Foundation ("Meyer Foundation"), has a history of dismissing leaders of color, including Dr. Terri Wright, a well-known African-American woman and revered leader in charitable giving who was hired as the Meyer Foundation's Vice President of Programming and Community.  Dr. Wright was hired in February 2018, but before joining the Meyer Foundation, she had been the first Executive Director of the Steve Fund which was charged with advancing the mental health and emotional well-being of college and university students of color, she was the director of the Centers for Public Health Policy and School, Health and Education at the American Public Health Association and spent 12 years as the Director for Health Policy at the Kellogg Foundation.  Despite her obvious talent and skill, Defendant Goren unceremoniously fired Dr. Wright a year later, thereby tarnishing Dr. Wright's stellar reputation and undermining the years of work that she put in to establishing herself as a leading voice in this industry.  Dr. Henson was next on Defendant Goren's target list.

Up until 2019, Dr. Henson had a legacy and stellar reputation as a business leader, civil rights proponent and a change agent in the organizations that she has led.  Armed with an MBA, a doctorate degree and years of successful experiences stewarding charitable organizations, education, and private institutions, Dr. Henson was persuaded to join WRAG by Defendant Goren in March 2019 as Defendant Goren convinced her of the need for a change agent in WRAG's leadership.  Defendant Goren explained that there were serious racial inequity issues

within the Association and she believed that Dr. Henson as CEO would be able to correct the problems.

Despite the red flags that Dr. Henson saw in the organization, like the sudden departure of Yanique Redwood, the African-American Board Chair of the Association who was replaced by Defendant Goren, the Board's refusal to allow Dr. Henson to speak with Ms. Redwood as part of the interview process as well as the statements by former President Copeland, that the internal issues of racial equity existed only because the Black employees at WRAG were a bad fit, Dr. Henson agreed to take the position.  She believed with the backing of the Board and a commitment from the Association to make change, she could accomplish the mission. Unfortunately, Defendant Goren had put other plans in motion.

As time went on, Dr. Henson realized that she was hired only for window dressing making WRAG's membership believe that WRAG was indeed sensitive and committed to seeing racism and racial inequity eradicated both within and outside of the Association.  It started right from the beginning of Dr. Henson's hiring.  Dr. Henson entered into an employment agreement which called on Defendant Goren and the Executive Committee to set goals, expectations and deliverables for the first 6 to 12 months of her tenure.  Despite requests to have these goals, expectations and deliverables set, Defendant Goren, who led the Executive Committee refused to meet and/or set the goals.  Dr. Henson was therefore left trying to hit a moving target since no such concrete measures were established.  This failure to erect a fixed set of goals for the Senior Leader of the Association created the racially motivated acts to follow.

When Dr. Henson took over, she learned of the deep problems that WRAG faced with racial equity in its employment ranks.  First, she learned that Defendant Greiner-Lott, Caucasian, disparaged her by saying that the only reason Dr. Henson was hired was because she was Black

and by inference, unqualified.  As a senior leader in WRAG's hierarchy, Defendant Greiner-Lott's overt racism needed to be rooted out.  In that regard, Dr. Henson complained to Defendant Goren.  Defendant Goren in turn did nothing to address the issue and thereby allowed Defendant Greiner-Lott to feel emboldened to disparage Dr. Henson and undermine her leadership as CEO.

Next, Dr. Henson spoke with two African-American employees who complained of an ongoing, consistent, and traumatizing hostile work environment created by their Caucasian peers and supervisors.  They were kept segregated, were ignored, diminished and treated less well than their white counterparts.  One of the employees was forced to give up her work station two days each week for the convenience of a part-time Caucasian contractor.  Both of the African-American employees felt as if they were second class citizens.  Dr. Henson addressed this with Defendant Goren and felt like this too landed on deaf ears

Next, when Dr. Henson discussed Defendant Goren's firing of Dr. Wright from the Meyer Foundation and told her that it had sent shock waves through the industry and raised issues of discriminatory conduct, Defendant Goren simply said that Dr. Wright was harmful to the Meyer Foundation because she created a "negative climate" and therefore she had to go.  Dr. Henson saw this statement and action by Defendant Goren as being the stereotypical justification for people who discriminate in employment decisions based on race: nothing specific, articulable or objective.

Similarly, when Dr. Henson hired two highly qualified, senior level employees of color into the organization to help bring diversity and needed skills to the team, Defendant Greiner-Lott, treated them in a hostile manner.  So much so that Dr. Henson received complaints from the new hires about the racial discrimination they felt from Defendant Greiner-Lott and other Caucasian employees of WRAG.  Dr. Henson addressed these complaints in a straight forward

manner.  She investigated the allegations, found that there was merit to the complaints and directed Defendant Greiner-Lott to stop the hostile acts against the employees of color.  Dr. Henson raised this issue with Defendant Goren, but instead of getting her backing or the backing of the Board, she was retaliated against for standing up for employees of color and was told instead that she had created a toxic environment.

In addition, in following with WRAG's purported commitment to racial equity, Dr. Henson called upon its membership to provide demographic data on the organizations they were gave grants to after WRAG's members reported giving over $255 million in grants to the community.  At this time, it was reported that organizations led by people of color accounted for only 3% of these grants. As such, Dr. Henson challenged WRAG's membership to increase the amount of grants awarded to organizations with greater diversity and that were led by leaders of color.

Following these efforts to change the climate at WRAG and making repeated attempts to correct the hostile racial environment at the Association, Dr. Henson was discriminatorily and retaliatorily targeted for termination.  Unlike any Caucasian employee before her, she was asked to write a statement summarizing only failures that she believed she was responsible for during her tenure.  Dr. Henson did not write this statement as she was not responsible for any failures and instead made great gains for WRAG.  She saw this as an attempt for the Defendants to justify an unlawful termination.

She received "anonymous" complaints from Defendant Hahn Le, a Board Member of WRAG, and the Executive Director of the Weissberg Foundation.  Defendant Le discriminatorily refused to meet with Dr. Henson despite repeated requests from Dr. Henson to get face to face feedback.  Instead, Defendant Le wrote and directed complaints be sent to WRAG about Dr.

Henson's performance.  The complaints were verbally shared with the Board and staff and sent "anonymously," all from the same IP address from the Weissberg Foundation.

Not surprisingly, at Defendants Goren, Lynch and Le's direction, the Board failed to support Dr. Henson in a number of efforts including the planning for the Race, Equity, and Future of Greater Washington Summit.  This Summit was an important deliverable that Dr. Henson worked tirelessly with other external partners to produce even without Board support. The Summit began with engagements rolling out in May 2020 that would culminate in September 2020, as it was on track as another successful venture of service as WRAG's CEO.

Underscoring the discriminatory and retaliatory nature of her firing, Dr. Henson was fired just 13 days after she retained counsel and filed a discrimination and retaliation complaint with the Board for the treatment she had received.  Prior to the Board's decision to fire Dr. Henson, she was not given any formal or written warning that her job was in jeopardy or that she needed to improve in any specific areas unlike Caucasian employees in the organization who receive progressive discipline and a chance to correct any perceived short-comings in performance if warranted before termination.  This lawsuit is meant to bring Justice, restore the good name of Dr. Henson and change the leadership and culture of WRAG.

## NATURE OF THE CLAIMS

1.      This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices taken against the Plaintiff, including Defendants' discriminatory treatment, harassment, hostile work environment, wrongful termination and unlawful retaliation against Plaintiff due to her race and her repeated complaints of discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C.

§ 2000 et seq, 42 U.S.C. §1981 and District of Columbia Human Rights Act ("DCHRA"), DC Code § 2-1401.01 et seq.

2.      During Plaintiff's employment at Washington Regional Association of Grantmakers, the Defendants repeatedly subjected the Plaintiff to unlawful discrimination and a hostile work environment based on her race as well as unlawful retaliation.

3.      Defendants' conduct was knowing, malicious, willful, wanton and/or showed a reckless disregard for Plaintiff.  As a result, the Plaintiff has suffered and continues to suffer economic and non-economic damages, permanent harm to her professional and personal reputations as well as severe emotional distress.

## JURISDICTION & VENUE

4.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 inasmuch as this action presents a federal question arising under Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §§ 2000 et seq., 42 U.S.C. § 1981,  and the District of Columbia Human Rights Act ("DCHRA"), DC Code § 2-1401.01 et seq.

5.      Venue of this action is based upon the fact that that Defendant WASHINGTON REGIONAL ASSOCIATION OF GRANTMAKERS' principal place of business is located within this judicial district and all the allegations made herein occurred within this judicial district.

## PARTIES

6.      Plaintiff, Dr. Madye Henson, is and was at the time of the occurrence a Maryland resident working within this judicial district, District of Columbia.  At all relevant times, the Plaintiff met the definition of an "employee" under all applicable statutes.

7.      Defendant Washington Regional Association of Grantmakers (hereinafter "Defendant WRAG") is a nonprofit organization with its principal place of business at 1100 New Jersey Avenue, SE, Suite 710, Washington, DC 20003. At all relevant times, Defendant WRAG was responsible for hiring, training, monitoring and supervising its employees and met the definition of an "employer" under all applicable statutes.

8.      At all relevant times, Defendant Nicola Goren ("Defendant Goren") was the Chair of the Board of Directors, supervised Plaintiff, and she participated directly in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against the Plaintiff.

9.      At all relevant times, Defendant Gretchen Greiner-Lott ("Defendant Greiner-Lott") was a Vice President, and she participated directly in the unlawful discrimination, retaliation, and otherwise unfair employment decisions and actions taken against the Plaintiff.

10.     At all relevant times, Defendant Kelly Lynch ("Defendant Lynch") was the Treasurer of WRAG's Board of Directors, and she participated directly in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against the Plaintiff.

11.     At all relevant times, Hanh Le ("Defendant Le") was a Board Member of WRAG's Board of Directors, and she participated directly in the unlawful discrimination, retaliation, and otherwise unfair employment decisions taken against the Plaintiff.

## PROCEDURAL REQUIREMENTS/ BACKGROUND

12.     Plaintiff filed a charge of discrimination against Defendant WRAG alleging facts of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 570-2020-02209.

13.     Plaintiff also filed a Verified Complaint against the Defendants in the Superior Court of the District of Columbia, Civil Division, Case No. 2020 CA −2934 B.  Subsequently, Defendants moved this case to the instant Court.

14.     On August 14, 2020, a Right to Sue notice was mailed to Plaintiff.

15.     All conditions and requirements precedent to the commencement of this action have been met.

## FACTUAL ALLEGATIONS

### Dr. Henson's Professional Background

16.     Prior to being selected and appointed as WRAG's President and Chief Executive Officer by its Board of Directors in March 2019, Dr. Henson served in various leadership positions as well as a consultant for different business, education, government and nonprofit organizations across the country assisting in organizational efforts to promote and implement diversity, inclusion, and racial equity initiatives.  Dr. Henson's expertise in racial equity was a skillset needed by Defendant WRAG as it entered into a public campaign to serve as a leader in combating and addressing racial equity issues and challenges not only within the organization, but also within the region.

### WRAG'S COMMITMENT TO RACIAL EQUITY

17.     WRAG's commitment to racial equity was approved by Defendant WRAG's Board in 2018 under the stewardship of former Board Chair, Yanique Redwood, African-American.  Thus, as part of WRAG's campaign to promote racial equity, the institution arranged for an internal "Racial Equity Audit" that yielded glaring issues of discriminatory and disparate treatment for employees of color within WRAG. These findings coupled with Ms. Redwood's abrupt departure from WRAG were the initial red flags for Dr. Henson about the organization.

## DR. HENSON'S CONCERNS ABOUT JOINING WRAG

18.     In that regard, Dr. Henson requested to speak with Ms. Redwood on this issue and of her experience working with WRAG before accepting the position. Dr. Henson was concerned that the Board sought to hire her so she could merely act as a figure head who would temporarily serve as window dressing for the institution at a time it faced a racial crisis.

19.     In response to Dr. Henson's request to speak directly with Ms. Redwood on these troubling matters, Dr. Henson was told that she would be unable to speak with Ms. Redwood. Dr. Henson was instructed to instead speak with Defendant Goren and Tracye Funn, an African-American Board Member.  This was a red flag.

20.     Moreover, Dr. Henson met with Tamara Copeland, the immediate past President of WRAG, to discuss her concerns taking on the role as WRAG's President as well as the racial equity audit results from Ms. Copeland's tenure. During Dr. Henson's meeting with Ms. Copeland, Ms. Copeland denied there were any issues of racial equity within WRAG and instead blamed WRAG's former African-American employees for the concerning audit results.  When Dr. Henson asked for additional information as to why she believed WRAG's African-American employees were at fault, she stated that they were not a good "fit" for the organization.  This was another red flag. In Dr. Henson's experience, any person who leads a team of employees and ascribes blame on a team's failure to a certain racial group instead of a distinct, objective set of reasons, is discriminatory and denotes a discriminatory culture.

## Acceptance of WRAG'S Offer to Serve as its President and Chief Executive Officer

21.     Dr. Henson next spoke with Defendant Goren and Ms. Funn.  During Dr. Henson's discussions with Defendant Goren and Ms. Funn, they both acknowledged that WRAG faced significant challenges regarding staffing, lack of diversity amongst its staff, the inability to

retain employees of color, and issues with the overall office culture and morale.  In light of these concerns coupled with the dismal audit results, both Defendant Goren and Ms. Funn extolled Dr. Henson for her proven work in race equity and expressed that WRAG needed a leader like her to bring in a diverse staff and help them directly address inequities that were and continue to be experienced by WRAG's African-American employees.

22.     Dr. Henson was thereby fooled into believing that the Board seemed genuine bringing on a strong leader who would bring an end to the racial inequity that existed within the organization.  Thus, Dr. Henson accepted the position after speaking with Dr. Goren and Ms. Funn, believing that she would have Board support.

23.     After Dr. Henson accepted the position, Defendant Goren, on behalf of the Board, paid lip service by expressing that the Board was not only impressed by Dr. Henson's organizational experience, but also her proven track record of "moving a racial equity agenda." In fact, Dr. Henson was hired as window dressing to make it appear to the charitable world that WRAG was committed to racial diversity and inclusion.

## DR. HENSON'S TENURE AS WRAG'S PRESIDENT AND CEO

24.     Dr. Henson entered into an Employment Agreement upon her hiring that set forth part, that "[i]n partnership with the Board Chair and Executive Committee, a set of expectations, goals, and deliverables for the first 6-12 months will be developed.  Salary review will occur annually.  Any salary increase will be tied to agreed-upon deliverables and approved by the Board."  This became another red flag for Dr. Henson as the Board's efforts to establish specific goals or objectives were never implemented despite her request to collaborate on this task with Defendant Goren and the Executive Committee.  This was another sign that the Board did not

have any intention of giving Dr. Henson a fair opportunity to meet Board established objectives or was committed to her success as WRAG's President and CEO.

25.     The Board clearly violated the terms of the agreement based on Dr. Henson's race.  Defendant Goren, as Board Chair, did not establish a concrete set of goals, deliverables or expectations for Dr. Henson and therefore had no basis on which to judge her performance.  This failure to identify goals, expectations or deliverables was not done to Caucasian employees who were informed of their performance goals, etc.  As a result, Dr. Henson was left to hit a moving target and tried to develop goals for herself, which she met.

26.     Immediately before Dr. Henson started her new role, she learned that Defendant Greiner-Lott applied for the President and Chief Executive Officer position.  Prior to Dr. Henson's appointment, Defendant Greiner-Lott informally served as WRAG's *de facto* President as all staff reported to her and all critical decisions regarding WRAG's operations were filtered through her as she decided which matters were to be discussed with Ms. Copeland.  Defendant Greiner-Lott believed that with her tenure and Board support she would be selected to formally serve as WRAG's next President.

27.     However, once Dr. Henson was chosen instead of Defendant Greiner-Lott, she began to discriminatorily tell members of the WRAG community that the main reason she was not chosen was because she was not African-American, and she continually disparaged Dr. Henson's leadership of WRAG.  The statement was overtly racist as it suggested that Dr. Henson was hired only because she was black and for no other reason.  The obvious implication was that Dr. Henson was unqualified to be CEO.  The statement likewise undermined Dr. Henson's leadership as it disparaged her and allowed those who Dr. Henson was supposed to lead to lose respect for her.  Dr. Henson was embarrassed and devastated by Defendant Greiner-Lott's

attempt to discriminatorily tarnish her reputation with WRAG's members even before she began

her new role.  No Caucasian employees of WRAG had to endure this type of racism, especially

from a senior leader of the organization.

28.     Dr. Henson attempted to root out this type of behavior complained to Defendant

Goren about Defendant Greiner-Lott's conduct.  Defendant Goren retaliated against Dr. Henson

by failing to take any action to rectify this behavior.  This emboldened Defendant Greiner-Lott to

continue her discriminatory behavior and undermine Dr. Henson's leadership.   This conduct of

belittling Dr. Henson lasted throughout Dr. Henson's tenure creating a hostile environment based

on race and violated the terms of the agreement.  In fact, Defendant Goren worked directly with

Dr. Greiner-Lott and Rita Cook, a consultant retained to serve as WRAG's Chief Financial

Officer, to set Dr. Henson up for failure.

29.     Despite Defendant Greiner-Lott's highly racist and inflammatory statements, both

internally and externally, Dr. Henson remained committed to her position in carrying out the

institution's mission as well as advancing its racial equity agenda.

30.     Specifically, as part of Dr. Henson's efforts to understand the culture of racism

within WRAG as reflected in the audit report, Dr. Henson spoke with former African-American

employees, Kendra Allen and Nia Nyamweya.  Both Ms. Allen and Ms. Nyamweya complained

of the ongoing hostile work environment they suffered by their Caucasian superiors during their

tenure.  Examples of such behavior included being kept segregated from their Caucasian peers

and supervisors, being ignored and disregarded by WRAG's Caucasian employees and the

blatant favoritism displayed toward their Caucasian counterparts by their supervisors.   In

addition, Ms. Allen complained that she was forced to give up her workstation to a Caucasian

contractor on the two days the contractor reported to the office leaving her without a workstation

on these days.  No Caucasian employees were forced to give up their workstations to contractors.

This hostile work environment made them feel as if they were second-class citizens among other

things.  When Dr. Henson asked both Ms. Allen and Ms. Nyamweya whether Ms. Copeland was

aware of the hostile environment fostered by WRAG's Caucasian employees, they told her that

Ms. Copeland was made aware and that she did not take any action to rectify such discriminatory

treatment.

31.     These experiences shared with Ms. Allen and Ms. Nyamweya made it clear that

Ms. Copeland merely served as figurehead as President as she did not take any action to address

the racist acts against African-American employees and was not genuinely committed to

confronting the issues of racial inequities that existed for WRAG's African-American

employees.  When Dr. Henson mentioned this to Defendant Goren, it fell on deaf ears.

32.     In addition, Dr. Henson learned that Ms. Redwood's departure was, in part, due to

the Board of Directors' failure to fully and genuinely support advancing a racial equity agenda.

33.     After learning of the prior employees' experiences and as part of Dr. Henson's

goal to advance WRAG's commitment to racial equity and to lead a more diverse staff, Dr.

Henson hired two highly qualified employees of color, Carmen Rodriguez, Director of

Communications, Technology and Admin, and Todd Pittman, Director, Corporate and

Foundation Advancement, to fill the roles of approximately five positions that were performed

by various staff members and consultants retained by WRAG.

34.     Both Ms. Rodriguez and Mr. Pittman not only observed but were forced to endure

a hostile work environment fostered by Defendant Greiner-Lott's and Ms. Cook's discriminatory

animus against non-Caucasian employees, including Dr. Henson, on account of their race.  In

fact, Defendant Greiner-Lott introduced herself to Ms. Rodriguez in an intimidating manner by

telling her that she is the "eyes and ears of the president" although she was aware that Ms. Rodriguez reported directly to Dr. Henson.

35.     Moreover, on multiple occasions, Dr. Henson shared with the Board's Executive Committee dialogue she had with her team on workplace culture that echoed concerns of racial equity within the organization, and offered solutions to address these issues.  Dr. Henson's solutions were often disregarded or belittled by Defendant Goren.

36.     One example of Dr. Henson's efforts to improve morale amongst WRAG's employees of color was to reconsider the workspace to ensure all employees had a permanent place to work within the office.  Due to the inability to expand WRAG's current workspace in the location it occupied, Dr. Henson received Board approval to enter into a lease for a larger office space to accommodate WRAG's staffing needs and to sublease the organization's existing space.

37.     While addressing these workspace concerns, Dr. Henson learned that shortly before she joined WRAG, Ms. Cook negotiated and extended WRAG's lease, nine months before the existing lease was set to expire, for an additional five years without notifying the Board.  Upon learning that Ms. Cook, a non-employee, negotiated and entered WRAG into an agreement without the Board's approval, Defendant Goren failed to take any action to discipline Ms. Cook.  Instead, Defendant Goren pretextually berated Dr. Henson for complying with the Board's plan in finding adequate workspace to accommodate the staff.  This not only demonstrated the disparate treatment to which non-Caucasian employees were subjected, but it also undermined Dr. Henson's authority as CEO and her ability to lead WRAG.  Defendant Goren did not berate Caucasian employees in this fashion or at all.

38.     As Dr. Henson continued transitioning into her new role, she frequently updated the Board on projects, objectives and accomplishments that supported WRAG's future and initiatives.  During these updates and Board presentations, Dr. Henson received encouragement from various Board Members regarding the progress she was making as she believed that she was surpassing organizational goals and objectives within a short time span.  This is especially true, since during these updates, she did not receive any negative feedback from the Board. However, because the Defendants' did not establish concrete deliverables or goals, Dr. Henson was left wondering whether her work was being acknowledged or appreciated.  This did not happen to non-African American employees of WRAG who always knew where they stood with regard to their accomplishments or lack thereof.

39.     In addition, as part of Dr. Henson's pledge as the new President and CEO, she committed to meeting with each Board Member and all members of WRAG's membership to develop direct relationships and to use their feedback in preparing for the organization's upcoming Strategic Plan.  In fact, over the summer of 2019, she met with nearly 70% of the membership in either small groups or one-on-one meetings where she was able to directly receive their support for WRAG's intended direction as an organization as well as hear each members' needs and/or concerns that were not addressed in prior years posing concerns about the future of their membership.  This, as it turned out, was the window dressing that Defendants' hoped to achieve by hiring Dr. Henson.

40.     Specifically, with respect to Dr. Henson's attempts to meet with WRAG's Board Members, Dr. Henson met with all but for Ms. Wagner and Defendant Le.  Both Ms. Wagner and Defendant Le ignored Dr. Henson's repeated attempts to set up meetings with them.  In contrast, Ms. Wagner and Defendant Le regularly communicated with WRAG's Caucasian staff

members, which included, Defendant Greiner-Lott, Ms. Cook, Rebekah Seder, former Senior

Manager as well as Channing Wickham, Executive Director of Washington AIDS Partnership

("WAP"), a fiscal sponsored program of WRAG.

41.     During these meetings, Dr. Henson received constructive feedback regarding

WRAG's work over the years as well as positive feedback regarding her leadership from

members and those Board Members with which she was able to meet.  Dr. Henson reported this

praise to Defendant Goren as well as to the WRAG's full Board of Directors.

42.     In addition, in an effort to improve the organizational culture and workplace

climate amongst the staff, Dr. Henson organized a two-day off-site staff retreat with Timothy Q.

Kime, Jr., President of Kime Leadership Associates, a renowned leader in executive coaching,

meeting facilitation, and team building.  In light of Dr. Henson's observations during her tenure,

it was clear the staff needed to strengthen their teamwork and teambuilding skills and increase

their understanding and appreciation of their colleague's differences, especially race.  This two-

day retreat received overwhelmingly positive feedback and reviews by WRAG's staff as

evidenced in Mr. Kime's Client Summary of the retreat where each staff member individually

acknowledged and shared how much they gained from the experience.

43.     When Defendant Henson discussed the success of the retreat and the documented

positive feedback and results the staff provided to Kime Leadership Associates, Defendant

Goren discriminatorily and retaliatorily dismissed Dr. Henson by down-playing the success of

the program and how it advanced the process of creating a workplace that was racially equitable.

Defendant Goren did not down-play or diminish the contributions of white employees.  When

Dr. Henson challenged Defendant Goren on why she believed there was negative feedback and

who provided it, Defendant Goren did not respond.  This too was discriminatory as it prevented

(if it was true that negative feedback was given) Dr. Henson from being able to address issues in the organization, something that she did not do to Caucasian employees.

44.     In the late Fall, Defendant Goren began pressing Dr. Henson on what was her next initiative to address racial equity amongst the Staff and Board Members.  As such, Dr. Henson recommended introducing a five-part series directly addressing issues identified in the racial equity audit to improve the overall concerns regarding WRAG's current climate.  The series was to be organized and facilitated by Ronnie Galvin, Vice President for Racial Equity and the Democracy Economy with the Democracy Collaborative, a leading expert in racial equity. Mr. Galvin was previously engaged by WRAG and even consulted with Defendant Goren's and Defendant Le's respective organizations, the Meyer Foundation and the Weissberg Foundation, on occasion.   Dr. Henson initially introduced the proposal during an Executive Committee meeting in February 2020, and later presented it to the full Board the following month.  During the March Board Meeting, Defendant Goren and Defendant Le publicly opposed Mr. Galvin's proposal as being "irrelevant" and discriminatorily questioned whether Mr. Galvin was the right "fit" to conduct the assessment and facilitate the staff in race equity workshops. It is clear that their opposition to Mr. Galvin's presentation was based on their own scheme to set Dr. Henson up for failure by thwarting her attempts to organize continuing racial equity training.  Thus, Defendant Goren and Defendant Le prevented the Board from being able to vote on the matter by tabling the decision to a later date despite the time sensitivity.  Defendant Goren's interference in her ability to lead the organization, such as being able to organize a workshop for staff, was clearly part of her orchestrated scheme to undermine Dr. Henson's authority.

45.     Despite her efforts, Dr. Henson was met with great disdain by Defendant Greiner-Lott as well as Defendant Greiner-Lott's close work associates Ms. Cook, Ms. Seder and Mr.

Wickham.  In collaboration with Defendant Goren and other Board Members, they strategized on

ways to discriminatorily undermine Dr. Henson's authority during her tenure.

46.     For example, in August 2019, Mr. Wickham complained about WRAG's office

moving and told Dr. Henson that WAP would not be moving with WRAG to its new location in

Navy Yard.  She told Mr. Wickham that she was looking at spaces that would accommodate

WAP's team as well in light of the current arrangement.  Dr. Henson also asked Mr. Wickham if

there were any neighborhoods that he would consider moving to, and he replied "no."  With

hopes he would reconsider his position, she requested Mr. Wickham later confirm with her

whether WAP will join WRAG in the move after he gave it some thought.  After our discussion,

Mr. Wickham called members of WRAG's Board as well as members of WAP's Steering

Committee and falsely claimed that Dr. Henson was pushing WAP out of WRAG. This lie was

further perpetuated by Ms. Wagner who also held a position on WAP's Steering Committee as

she shared this allegation against Dr. Henson with others.  In fact, Mr. Wickham only refused to

move WAP's office because the current location was within walking distance from his home;

however, it was in collaboration with Defendant Greiner-Lott and Ms. Cook that he portrayed

this as an issue concerning Dr. Henson's leadership and thus another discriminatorily and

retaliatorily motivated ploy to set her up for failure.

47.     Notably, once the move finally occurred in January 2020, Defendant Greiner-Lott

refused to work from the new office for nearly a month.  Instead, she reported to the old location,

which was not outfitted with any resources, including internet, phones or administrative staff.

Defendant Greiner-Lott's recalcitrance was a clear effort to undermine Dr. Henson's authority

and tarnish her reputation.

48.     In November 2019, Dr. Henson met with Defendant Goren for an offsite one-on-one meeting to discuss various WRAG related matters.  During this meeting, Defendant Goren mentioned that she was feeling backlash on account of her role in abruptly terminating Dr. Terri Wright, a senior level African-American executive, from her own organization, the Meyer Foundation.  In response, Dr. Henson shared with Defendant Goren that the circumstances surrounding Dr. Wright's termination are being questioned by leaders in the community as many believe the termination was discriminatorily motivated.  In response, Defendant Goren acknowledged that she sensed this may have been the perception, but she had no option because of the "negative climate" Dr. Wright was fostering.  Dr. Henson saw this as a stereotypical, pretextual reason for an illegal firing: no objective reasons, simply a personality conflict.  Not surprisingly, these claims of creating a "negative climate" were similarly used by Defendant Goren against Dr. Henson as a pretext to support her unlawful termination.

49.     The hostile work environment heightened in November 2019 during a weekly staff meeting.  During this meeting, Defendant Greiner-Lott and Ms. Cook continued to jointly target Ms. Rodriguez, Hispanic, by berating her and belittling her work and character amongst her peers with micro aggressions.  Ms. Rodriguez became fed up with their harassment and discriminatory animus, and publicly complained about the hostile work environment they were fostering against her at the meeting.  Dr. Henson ended the meeting after Ms. Rodriguez's complaint.

50.     Dr. Henson addressed Ms. Rodriguez's complaint of racism by directly meeting individually with Ms. Rodriguez, Defendant Greiner-Lott and Ms. Cook the following day. During Dr. Henson's meeting with Ms. Rodriguez, she further complained about the hostile work environment fostered by Defendant Greiner-Lott and Ms. Cook on account of her race, their

efforts to impede her ability to succeed as well as their constant micro aggressions against her.
Specifically, Ms. Rodriguez complained about Defendant Greiner-Lott's and Ms. Cook's
discriminatory animus against her and their constant criticisms of all initiatives she introduced
and was responsible for implementing at WRAG such as new payroll and human resources
database, Paylocity, as well as the new check processing procedures to allow for greater
accountability and tracking as compared to WRAG's prior system.  In addition, she complained
of Defendant Greiner-Lott's outright refusal to participate in Salesforce Training, the required
system used to track all WRAG activities, after Dr. Henson learned that Defendant Greiner-Lott
did not know how to utilize this database.  Defendant Greiner- Lott's continued refusal to learn
Salesforce resulted in redundancy and inefficiency in staff efforts.  Defendant Greiner-Lott and
Ms. Cook did not treat their Caucasian peers in such a discriminatory fashion.

51.     In addressing Ms. Rodriguez's complaints of discrimination, Dr. Henson
conducted an investigation that consisted of verifying the information given to her by Ms.
Rodriguez and then meeting with Ms. Cook and Defendant Greiner-Lott, individually.  After
getting their version, Dr. Henson simply told them that they could not continue to act in a hostile
and disrespectful manner toward their peers.  Dr. Henson further admonished them for their
conduct and told them that if she had to engage them in another conversation on this issue, she
would be forced to take disciplinary action against them.  In addition, when meeting with
Defendant Greiner-Lott, Dr. Henson told her that she was aware of the negative feedback and
falsities she was communicating about her leadership and the organization, which she
acknowledged and admitted.  Dr. Henson encouraged Defendant Greiner-Lott to address any
concerns that she may have with her directly so we could work together as a team for the benefit

of WRAG's success.  In this fashion, Dr. Henson supported Ms. Rodriguez's complaint of

discrimination and tried to correct the problem that existed within the organization.

52.     Soon after reprimanding Ms. Cook and Dr. Greiner-Lott for their ongoing

discriminatory behavior toward Ms. Rodriguez and other employees of color, Defendant Goren

began retaliating against her for disciplining Caucasian employees. She began accusing Dr.

Henson of creating a toxic work environment and a "negative climate," similar to the pretextual

claims she made against Dr. Wright.  In contrast, when Dr. Henson made personnel decisions

with respect to her employees of color no action was taken by Defendant Goren or the Board.

53.     The retaliation continued as Defendant Goren began berating Dr. Henson because

there were WRAG members who were purportedly unhappy with her.  Dr. Henson was surprised

to learn of these complaints and asked for additional feedback so she could directly address these

concerns.  She further questioned the nature of these complaints as she was in frequent contact

with members, community partners, and the Board, and no such feedback was being

communicated directly to her as she encouraged an open door policy.  Instead of providing Dr.

Henson with specific feedback to identify specifically what was "fact or fiction" as she

requested, Defendant Goren refused to do so in an effort to protect Defendant Greiner-Lott, Ms.

Cook as well as those Board Members, which included Defendant Le, Ms. Wagner, and

Defendant Lynch who were discriminatorily scheming to set up Dr. Henson for failure by

lodging complaints against her riddled with falsities.

54.     In addition, after Dr. Henson's "Year in Review" presentation to the Board and

WRAG community highlighting WRAG's 2019 accomplishments under her leadership, which

included ending the year with a balanced budget despite concerns of a projected deficit for the

year, exceeding the number of planned programs, surpassing membership objectives, advancing

WRAG's commitment to racial equity by encouraging WRAG members to award grants to diverse organizations led by people of color after it was reported that only 3% of the $255 million allocated to the community were given to organizations led by leaders of color as well as engaging and establishing meaningful relationships to the benefit of WRAG, Defendant Goren dismissed her.  She condescendingly told Dr. Henson that "nobody wanted to hear about all the good" and that she and the Board wanted to hear more about her "wrongs."  When Dr. Henson inquired into what specific "wrongs" she should discuss, Defendant Goren was unable to provide her with any specific feedback on what she meant by her request.

55.     As part of Defendant Goren's effort to undermine Dr. Henson's authority and reputation amongst the WRAG community, Defendant Goren further directed her to submit a memorandum detailing her "wrongs" in an apology to WRAG's 2020 membership in her anticipated letter for the New Year.  Dr. Henson complained to Defendant Goren about her discriminatory and retaliatory request as she exceeded her goals, was performing without issue, was unaware of any specific complaints and/or deficiencies concerning her performance, and about my confusion of Dr. Goren's repeated reference to Dr. Henson's purported "wrongs." Specifically, Dr. Henson further complained about the harmful implications on the organization, her reputation and authority of complying with Defendant Goren's request.  In contrast, the Board of Directors had never forced any Caucasian employee to send an apology letter itemizing their "wrongs" internally or externally.  It was clear they were hoping to use any such memorandum as a pretext to support their attempts to unlawfully terminate Dr. Henson.  This was further evidenced by the fact they failed to collaborate with Dr. Henson in developing expectations, goals and deliverables as President.  The Board was aware that if Dr. Henson met

any set objectives they formally established, this would thwart their attempt to find any pretext to support their goal of discriminatorily and retaliatorily terminating her.

56.     Notably, after Dr. Henson submitted her New Year message to WRAG's membership, Defendant Greiner-Lott angrily summoned Dr. Henson to her office questioning why she would send a correspondence to the membership without allowing her to first review it. Dr. Henson was taken aback Defendant Ms. Greiner-Lott's comment in light of the fact she was the President and there was no such protocol on how correspondence to membership was to be delivered authorizing the Vice President to approve the President's messages.

57.     On account of Defendant Goren's failure to provide Dr. Henson with support in dealing with Defendant Greiner-Lott and her close colleagues, they felt emboldened to disrespect her leadership.  Ms. Cook, Ms. Seder, Mr. Wickham, and Defendant Greiner-Lott often met in the office before hours and offsite at local establishments to publicly criticize her leadership and the organization.  Despite the fact Dr. Henson repeatedly expressed concerns about their conduct and the overall effect it was having on workplace morale, Defendant Goren failed to take any action to remedy this hostile work environment as it was made clear if Dr. Henson took any further intervention in rectifying their discriminatory conduct she would be further berated.  It was clear that their behavior was encouraged by Defendant Goren, Defendant Le, Defendant Lynch and Ms. Wagner, and it continued on unabated.  Defendant Greiner-Lott and Ms. Cook began excluding her from being part of critical decisions and meetings as well as outright disregarding directives Dr. Henson gave them.  Their actions throughout the year, at the direction of Defendant Goren, Defendant Wagner, Defendant Le and Ms. Lynch, adversely affected Dr. Henson's reputation and authority within WRAG.

58.     As part of Defendant Goren's orchestrated scheme to sabotage Dr. Henson, Defendant Goren continued to discriminatorily and retaliatorily lodge falsities about her and her performance, including, in violation of her duties as Board Chair, purposely providing the Board of Directors with false information during a closed Executive Session in December 2019. Notably, Defendant Goren used these falsities to prevent Dr. Henson from receiving any compensation increase that was to take place at the end of each year depending on whether she met her deliverables, which were notably never provided to her.

59.     In this meeting, Defendant Goren wrongly accused Dr. Henson of being responsible for WRAG losing membership and for incurring increased expenses by hiring Ms. Rodriguez and Mr. Pittman.  However, these accusations were outright false.  Despite Defendant Goren's prior warnings that Dr. Henson was going to lose members because they were purportedly unhappy with her leadership, Dr. Henson was able to secure 106 members during the 2020 Annual Membership Campaign.  Notably, at the time Dr. Henson joined WRAG, WRAG had 106 members.

60.     Moreover, with respect to the false allegations lodged against Dr. Henson regarding WRAG's financial state, membership revenue increased and exceeded the yearly annual budgeted amount set for 2020 under her leadership.  In fact, Dr. Henson was able to significantly decrease personnel costs with the hiring of Ms. Rodriguez and Mr. Pittman.  These strides in WRAG's financial status were further reflected in a report made to the Finance Committee which was chaired by Defendant Lynch.  This information was also shared with the Executive Committee.  Ultimately, Dr. Henson rectified Defendant Goren's and Defendant Lynch's misrepresentations by conveying that the cost of hiring highly-qualified, full-time staff members such as Ms. Rodriguez and Mr. Pittman was a cost-efficient alternative to WRAG's

previous practice of hiring numerous staff members and consultants that were not streamlined in their tasks and never reported to the office.

61.     The accusations regarding Dr. Henson's purported mismanagement were further perpetuated by Ms. Cook, a consultant who acted as the organization's Chief Financial Officer for nearly a decade before Dr. Henson joined WRAG.  Not only did Ms. Cook, at the direction of Defendant Lynch, Defendant Goren and Ms. Wagner, falsely accuse Dr. Henson of not properly working in the confines of the 2019 budget, but also shared this publicly as some of WRAG's staff repeated these claims in an effort to defame Dr. Henson's character and leadership.  For instance, Mr. Wickham expressed in an email to Ms. Cook "I'm in denial that you're leaving. I've been hoping that the WRAG board would get rid of Madye, and would ask you to get the financial situation back on track."  However, there were no financial concerns documented and any financial reporting related to WAP was the responsibility of Ms. Cook.  Moreover, any concerns regarding the communication of such information were based upon Ms. Cook's own lack of transparency and failure to provide Dr. Henson with the information she sought in a timely fashion.  In fact, Ms. Cook and Defendant Lynch worked directly on several matters excluding Dr. Henson from critical financial decisions that she should have been part of as the President of WRAG.

62.     For example, in late 2019, in preparation for the 2020 budget planning, Dr. Henson met with Ms. Cook and notified her that WRAG needed to reduce the accounting budget by $70,000 for 2020 as this was market rate for accounting in similar organizations.  Without providing Dr. Henson with any notice, Ms. Cook notified Defendant Goren, Defendant Lynch as well as her fellow colleagues that she was transitioning out of WRAG in light of Dr. Henson's need to reduce the accounting budget.  Dr. Henson was only alerted of this a month before she

was slated to transition out of WRAG.  It was clear this delayed notice was to affect Dr.

Henson's ability to successfully close out the year's finances and proceed with onboarding

another accounting team in a timely fashion.  Despite this obstacle, Dr. Henson was able to

identify and recommend Carters Hutchings CPA, a firm headed by an African-American woman,

Cheryl Carter Hutchings, in January 2020.

       63.      During the selection process, Defendant Lynch sought to include Ms. Cook, a

competitor, in this decision which would have required Ms. Cook receiving proprietary

information from Carter Hutchings, which Dr. Henson opposed due to the unethical

ramifications.  Eventually, Defendant Goren and Defendant Lynch moved forward with Dr.

Henson's recommendation, after much opposition questioning Ms. Hutchings' qualifications.

Despite her stellar accolades and glowing reviews from other peers on a national level,

Defendant Lynch, Defendant Goren and Ms. Cook set up obstacles for Ms. Hutchings to

successfully perform her job on account of their own discriminatory animus against African-

Americans, but also as part of their efforts to undermine Dr. Henson's authority.  In addition, as

part of Ms. Hutchings' onboarding, she met with all staff and fiscal partners to ascertain the

operations and state of WRAG's financial affairs.  Ms. Hutchings reported to Dr. Henson that all

meetings, except for her meeting with Defendant Greiner-Lott, went well.  Specifically, Ms.

Hutchings complained that Ms. Greiner-Lott treated her in a hostile and confrontational manner

throughout their discussion.

       64.      On several occasions, Defendant Lynch would outright disregard and send back

financial reports from Ms. Hutchings if it did not support the Board's desire to set up Dr.

Henson.  In fact, there were times when Defendant Lynch would outright disregard Ms.

Hutchings' findings and insist on providing the Board with knowingly inaccurate reports that she

created as Ms. Hutchings' reports conflicted with Defendant Lynch's discriminatory and retaliatory agenda targeting Dr. Henson.  In addition, Defendant Lynch began inundating Ms. Hutchings with requests for various financial reports that were never previously requested of Ms. Cook and were not part of WRAG's Agreement with Ms. Hutchings.  Defendant Lynch was closely involved in all negotiations and discussions regarding Ms. Hutchings' contract and never suggested the agreement encompass these additional reports.  Thus, it is clear that Defendant Lynch was using Ms. Hutchings as a way to discriminatorily set up Dr. Henson for failure by discrediting her recommendation of Ms. Hutchings.

65.     In addition, although Ms. Hutchings' accounting services were stellar, Defendant Lynch insisted on Ms. Cook staying on past her agreed upon transition date requiring the organization pay both Ms. Hutchings and Ms. Cook for the same service.  It became clear that Defendant Lynch, along with the other Board Members, were concerned that Ms. Hutchings would not assist them in their scheme to set up Dr. Henson for termination.

66.     Ultimately, Defendant Goren sent Dr. Henson an email on February 1, 2020 criticizing various aspects of her performance, which was clearly an attempt to paper trail Dr. Henson. Dr. Henson submitted a rebuttal to which she never received a response.  One of the items addressed budgetary concerns regarding Dr. Henson's hiring of Ms. Rodriguez and Mr. Pittman, a falsity that was corrected by Ms. Hutchings.  Under Ms. Hutchings' review and ability to get the financial data, something which she repeatedly requested from Ms. Cook, her hiring decisions saved the organization significant money. Moreover, in Dr. Henson's rebuttal, she provided Dr. Goren a financial snapshot that showed she either surpassed the organization's annual financial goals or was on track year-to-date to meet the 2020 approved budget.

67.     Most egregiously, Defendant Goren stated that many, without providing any factual basis, believe Dr. Henson's expertise is in "diversity and inclusion" rather than "racial equity." She further accused Dr. Henson of straying away from the Organization's commitment to racial equity.  This was shocking not only because of Dr. Henson's thirty year proven track record addressing issues of equity and race, but she, and the Board, were aware that Dr. Henson was diligently working on various internal initiatives that garnered support including working with the new co-chairs of the Racial Equity Working Group (REWG) to improve the existing structure of the committee to support the diverse needs of members in the area, as well as provide support for the Race Equity and Future of Greater Washington Regional Summit.  This Summit was a concept developed by seven regional organizations, which were working together prior to Dr. Henson's arrival at WRAG.  Because attempts at coordinating a Summit were stalled, Dr. Henson was asked by the Summit Partners to help focus the initiative and drive this endeavor forward which she did.   However, at all stages of her work in planning of the Race Equity Summit with the Summit Partners, Defendant Goren and Defendant Le continually opposed her efforts.   They falsely shared and complained that there weren't any resources to proceed with the Summit, it lacked a budget, no clear plan, no support and sponsorship, or a cohesive program.  These were all outright false as all of the logistics were planned and handled within a set budget, which included securing Soledad O'Brien as a keynote speaker.  It became clear that they did not want Dr. Henson to have a leadership role in this event, despite her efforts to reenergize the partners in this initiative, and was emerging to be a highly successful venture around racial equity not only in this region, but in the country.

68.     In March 2020, Defendant Le was appointed by Defendant Goren to chair the Strategic Planning Committee.  Defendant Le criticized and demeaned any effort Dr. Henson put

into WRAG's Strategic Planning efforts.  Her scheme to set up Dr. Henson was so blatant after she criticized an RFP that Dr. Henson customized that was based upon a national template used by other regional associations across the country.

69.     Under Defendant Goren's direction and leadership, Defendant Le frequently criticized Dr. Henson verbally, but also through program evaluations as a way to paper trail.  A simple check of these so called anonymous "complaints" revealed the retaliatory and discriminatory nature behind them.  In an investigation of the evaluations across five WRAG programs led by Dr. Henson, the most negative evaluations of these programs came from an IP address from Defendant Le's office, the Weissberg Foundations.

## Dr. Henson's Unlawful Termination

70.     On May 11, 2020, Dr. Henson submitted a monthly report to the Board which reflected the fact that the organization exceeded its annual goal for memberships, secured a needed Payroll Protection Program (PPP) loan in the amount of $401,800, garnered wide-spread cross sector for two policy efforts, and other accomplishments reflecting Dr. Henson's stellar and dedicated performance.  However, instead of receiving any praise or acknowledgment for her hard work, she was discriminatorily and retaliatorily presented with a decision to resign by the close of business on May 12, 2020.  If she resigned, she would be allowed additional time to remain as an active employee allowing her to assist in her own transition or be fired.  These options were clearly done to mask the Board's unlawful desire to terminate Dr. Henson.

71.     When Dr. Henson questioned the motives behind her termination as she believed she was surpassing any and all the organizational goals and yearly agenda objectives that there could be without having a concrete set of criteria.  Defendant Goren unlike with Caucasian employees, failed to provide Dr. Henson with any substantive feedback or warn her that she was

in jeopardy of losing her job.  Moreover, Dr. Henson requested that the Board memorialize the reasons for her termination in writing, which Defendant Goren refused.

72.     When Dr. Henson requested additional time to consider WRAG's discriminatory and retaliatory options presented to her on how her termination is to be characterized in light of the suddenness of this decision and the COVID pandemic, Defendant Goren did not provide Dr. Henson with the full amount of time she requested, which was merely one (1) week.

73.     Defendant Goren further threatened Dr. Henson not to disclose WRAG's unlawful decision to terminate her with others by warning her "if the Board learns that our discussion with you are not being kept confidential and/or that you are communicating with members, consultants or staff regarding your departure, we will immediately move forward with the termination."

74.     On May 15, 2020, a formal complaint of discrimination and retaliation to Defendant Goren and WRAG's full Board was made on Dr. Henson's behalf by her counsel.   In addition, this complaint also communicated Dr. Henson's refusal to voluntarily resign.

75.     After being notified of Dr. Henson's decision to retain counsel, she was further retaliated against, which culminated in her termination on May 28, 2020.   Immediately, upon her termination, WRAG issued a statement announcing Dr. Henson's "departure" as occurring "effectively immediately," which was in a further effort to tarnish her reputation within the community.  In addition, Board Members have called a wide variety of community leaders to discuss Dr. Henson's termination claiming it was a "personnel" matter.  The Board's retaliatory conduct is tarnishing Dr. Henson's reputation and harming her attempts to find other employment.

76.     Since Dr. Henson's unlawful termination, the Race, Equity and Future of Greater Washington Summit has proceeded as Dr. Henson planned without any significant changes.  Dr. Henson dedicated tireless hours working with dedicated Partners to ensure that the effort was successful.  As a result of her hard work, the first part of the Summit series was held on June 11, 2020 and had over 500 hundred participants that joined the virtual meeting.  It is clear that Defendant Goren did not want her to continue in a leadership role and receive any of the recognition for Dr. Henson's efforts.  Instead of supporting Dr. Henson's leadership in this effort, the Board used every opportunity to mask its discriminatory and retaliatory decision to terminate Dr. Henson while trying to make it appear that the WRAG Board and organization is committed to Racial Equity.  This was a clear attempt by Defendant Goren to try and repair the damage that has been done to her reputation after she terminated Dr. Henson, and Dr. Wright who was another well-respected African-American leader in this sector and the second such African American female in less than a year.

77.     The retaliation has been ongoing since Dr. Henson's termination.  In retaliation for complaining of the discriminatory and retaliatory treatment to which Dr. Henson was subjected, WRAG did not provide her with the requisite COBRA forms in a timely manner as required by law resulting in a disruption of her health coverage.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Race Discrimination and Harassment in Violation of Title VII as against Defendant WRAG)

78.      Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.     Defendant WRAG's conduct, by and through it employees, board members and/or agents, in treating Plaintiff in an equal manner to other employees, discriminatorily denied

Plaintiff such treatment on the basis of her race in violation of Title VII, 42 U.S.C. § 2000e.  By

the actions described above, Defendant WRAG denied the Plaintiff equal terms and conditions of

employment, including, but not limited to subjecting her to disparate work conditions, denying

her the opportunity to work in an environment free of unlawful harassment and discrimination,

terminating her and denying her compensation and other benefits given to similarly-situated non-

African-American colleagues.

80.     Defendant WRAG, in failing to adequately investigate and remedy the treatment

to which the Plaintiff was subjected, despite Defendant WRAG's knowledge of the conduct,

discriminatorily denied the Plaintiff equal treatment on the basis of her race in violation of Title

VII.

81.     Defendant has discriminated against the Plaintiff on the basis of her race in

violation of Title VII by fostering, condoning, accepting, ratifying, and /or otherwise failing to

prevent or to remedy a hostile work environment that included, among other things, severe and

pervasive harassment of the Plaintiff by her supervisors, colleagues and board members.  As a

result of the Defendants' conduct, the Plaintiff has suffered and will continue to suffer past and

future economic and emotional harm.

82.     As a direct and proximate result of the Defendant's unlawful and discriminatory

conduct in violation of Title VII, Plaintiff has suffered monetary and/or economic damages,

including, but not limited to, loss of income and benefits for which she is entitled to an award of

monetary damages and other relief.

83.     As a direct and proximate result of Defendant's unlawful and discriminatory

conduct in violation of Title VII, Plaintiff has suffered severe mental anguish and emotional

distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

84.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000 <u>et seq</u>. for which Plaintiff is entitled to an award of punitive damages.

85.     Defendant WRAG should be held liable on this count and the Plaintiff should be awarded all appropriate relief.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**(Retaliation in Violation of Title VII as against Defendant WRAG)**

86.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 85, inclusive, as if fully set forth herein.

87.     Defendant WRAG, through its employees, board members and/or agents, have retaliated against the Plaintiff, by <u>inter alia</u>, harassing her, threatening her, humiliating her, stripping her of important responsibilities, exposure and other privileges of employment that are extended to other employees, terminating her employment and undermining her ability to effectively perform her job in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000 <u>et seq</u>. for her opposition to Defendant's discriminatory and harassing practices toward herself and/ or her participation in criticizing and lodging complaints against Defendant's discriminatory and harassing practices.

88.     As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered monetary and/or economic damages, including, but not limited to, loss of income, benefits for which she is entitled to an award of monetary damages and other relief.

89.     As a direct and proximate result of the Defendant's unlawful and retaliatory conduct in violation of Title VII, the Plaintiff has suffered mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Race Discrimination in Violation of 42 U.S.C. § 1981 as Against all Defendants)

90.      Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 89, inclusive, as if fully set forth herein.

91.     Defendants' conduct, by and through its agents, in treating Plaintiff in the manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of her race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of her employment and the employment agreement that was entered into for that purpose.

92.     Defendants in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected, despite the Defendants' knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of her employment. Plaintiff was intentionally subjected to a racially motivated hostile work environment that was permeated with discriminatory intimidation, ridicule and insult that violated 42 U.S.C. 1981. The harassment Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her emotional distress and depressed feelings.

93.     The discriminatory acts of the Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's race. Defendants engaged in an

ongoing and continuous pattern and practice of intentional discrimination, which was the Defendants' standard operating procedure against African-American employees, up until Plaintiff's unlawful termination.

94.     As a result of the Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

95.     Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation in Violation of 42 U.S.C. § 1981 as Against All Defendants)

96.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 95, inclusive, as if fully set forth herein.

97.     Defendants have retaliated against Plaintiff, by inter alia, harassing her, threatening her, humiliating her, stripping her of important responsibilities, exposure and other privileges of employment that are extended to other employees, terminating her and undermining her ability to effectively perform his job in violation of 42 U.S.C. §1981 for her opposition to Defendants' discriminatory practices toward herself and/or her participation in criticizing and lodging complaints about Defendants' discriminatory practices.

98.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of 42 U.S.C. §1981, Plaintiff has suffered monetary and/or economic damages, including but not limited to, loss of income and benefits for which she is entitled to an award of monetary damages and other relief.

99.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of 43 U.S.C. 1981, the Plaintiff has suffered mental anguish and emotional distress,

including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Race Discrimination in Violation of DCHRA as Against All Defendants)

100.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 99, inclusive, as if fully set forth herein.

101.     Defendants have discriminated Plaintiff on the basis of her race, in violation of the DCHRA, by denying to her equal terms and conditions of employment, including but not limited to, subjecting her to disparate working conditions, denying her the opportunity to work in an environment free of unlawful discrimination, denying her opportunities for professional growth, denying her pay and other benefits equal to that of similarly situated Caucasian and/or non-African-American employees, and unlawfully terminating her.

102.     Defendants have discriminated against Plaintiff on the basis of her race in violation of the DCHRA by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy discrimination of Plaintiff.

103.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the DCHRA, Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

104.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the DCHRA, Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, physical manifestations of stress, loss of self-esteem and

self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Retaliation in Violation of DCHRA as Against All Defendants)

105.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 104, inclusive, as if fully set forth herein.

106.    Defendants have retaliated against Plaintiff by, inter alia, harassing her, threatening her, humiliating her, undermining her ability to effectively perform her job, paying her less than her similarly-situated peers, and terminating her in violation of the DCHRA for her opposition to Defendants' discriminatory practices toward her as well as other non-Caucasian employees, and/or her participation in criticizing and lodging complaints about Defendants' discriminatory practices toward herself and other workers.

107.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the DCHRA, Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

108.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the DCHRA, Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, physical manifestations of stress, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of 42 U.S.C. § 1981 as Against the Individually-Named Defendant)

109.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 108, inclusive, as if fully set forth herein.

110.    Defendants Goren, Greiner-Lott, Le, and Lynch knowingly and/or recklessly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the DCHRA by actively participating in the unlawful conduct set forth above.

111.    Defendants have discriminated against Plaintiff on the basis of her race through a pattern and practice of fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive race discrimination by the Defendants.

112.    As a direct and proximate result of Defendants Goren, Greiner-Lott, Le, and Lynch's unlawful discrimination and retaliation against Plaintiff in violation of the DCHRA, Plaintiff suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

113.    As a direct and proximate result of Defendants Goren, Greiner-Lott, Le, and Lynch's unlawful discrimination and retaliation against Plaintiff in violation of the DCHRA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, physical manifestations of stress, loss of self-esteem and self-confidence, and emotional pain and suffering for which  she is entitled to an award of monetary damages and other relief.

## <u>DEMAND FOR RELIEF</u>

**WHEREFORE**, Plaintiff requests the following relief:

A.      Declare that Defendants intentionally and willfully discriminated against Plaintiff on account of her race in violation of;

B.      Declare the Defendants retaliated against Plaintiff as a result of her complaints of discrimination;

C.      Declare that the individually-named Defendants aided and abetted violations of;

D.      Declare that Defendants intentionally and willfully caused Plaintiff emotional distress;

E.      Award of compensatory to Plaintiff;

F.      Award of punitive and liquidated damages to Plaintiff;

G.      Award attorney's fees and costs;

H.      Award of interest and costs;

I.      A money judgment to recoup any tax loss suffered by Plaintiff as a result of receiving a lump sum award of back pay rather than having received wages over a period of years;

J.      Award such other relief in law or equity as this Court deems appropriate.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Dated:  New York, New York
         August 25, 2020

Yours etc.,

THE COCHRAN FIRM

Attorneys for Plaintiff

_____/s/_____

TRACEY L. BROWN (DC Bar No. 450898)
DEREK S. SELLS (DC Bar No. 420398 -
Admission Pending in this Court)

55 Broadway, 23rd Floor
New York, NY 10006
Tel No.: (212) 553-9215
Fax No.: (212) 227-8763
tbrown@cochranfirm.com
dsells@cochranfirm.com

<u>ATTORNEY'S VERIFICATION</u>

STATE OF NEW YORK   )

                                        ).SS:

COUNTY OF NEW YORK)

The undersigned, an attorney, duly admitted to practice law in the Courts of New York and the District of Columbia, and hereby deposes and states that:

I am the Managing Partner of THE COCHRAN FIRM, attorneys for the plaintiff in the above action.  I have read the annexed AMENDED COMPLAINT and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon the following: investigation, interviews with client, records, reports, documents, correspondence, data, memoranda, etc., contained in the file.

The reason I make this verification instead of plaintiff, is that the Plaintiff resides out of the County of New York, wherein I maintain my offices.

I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
           August 25, 2020

_____/s/_____
TRACEY L. BROWN