UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TERRI D. WRIGHT** *Plaintiff*, v. **EUGENE & AGNES E. MEYER FOUNDATION,** *et al.*, *Defendants*. | Civil Action No. 20-2471 (FYP) |

**MEMORANDUM OPINION**

Plaintiff Terri D. Wright brings this lawsuit against her former employer, the Eugene and Agnes E. Meyer Foundation (the "Foundation"), and Nicola O. Goren, the President and Chief Executive Officer of the Foundation, alleging (1) racial discrimination, in violation of 42 U.S.C. § 1981 ("Section 1981"), as to both Defendants; (2) defamation, as to Ms. Goren; and (3) breach of contract, apparently as to both Defendants. *See generally* ECF No. 1-3 (Complaint). Plaintiff's claims arise from the alleged violation of a Severance Agreement that she and the Foundation entered upon the termination of Plaintiff's employment. Dr. Wright alleges that the Foundation and Ms. Goren breached the Mutual Non-Disparagement Clause contained in the Severance Agreement, when Ms. Goren made negative statements about Dr. Wright that were racially motivated. On September 10, 2020, the Defendants filed their Motion to Dismiss, *see* ECF No. 4 (Defendants' Motion), alleging that Plaintiff fails to state a claim.[1] For the following reasons, the Court will grant Defendants' Motion.

---

[1] Dr. Wright filed an Opposition on September 24, 2020, *see* ECF No. 7 (Plaintiff's Opposition), and the Defendants filed a reply on October 6, 2020, *see* ECF No. 9 (Defendant's Reply).

## BACKGROUND

Established in 1944, the Foundation is a philanthropic organization that provides "grants aimed at advancing charitable and educational initiatives within the District of Columbia metropolitan region." *See* Compl. at 1. In recent years, the Foundation has increased its efforts to support projects aimed at addressing issues of racial inequity. *Id.*

Dr. Wright has dedicated her career to "advancing racial and social equity," and has held various leadership positions at governmental, private, and public institutions. *Id.*, ¶ 10. The Foundation hired Dr. Wright as the Vice President of Program and Community in February 2018. *Id.*, ¶¶ 12, 14. In that role, Dr. Wright was "responsible for overseeing the Foundation's programs and community engagement efforts," which included "grant making, capacity building, collective action and advocacy across the region." *Id.*, ¶ 17. At the end of 2018, Dr. Wright received a favorable performance evaluation, and Ms. Goren awarded her a raise. *Id.*, ¶ 24.

Nevertheless, Dr. Wright alleges that Ms. Goren soon began to raise "subjective and false criticism aimed at [Wright's] interpersonal skills and communication issues that no one in the organization had raised previously." *Id.*, ¶ 25. Dr. Wright alleges that this criticism was a pretext to mask discriminatory animus. *Id.*, ¶ 26. On October 1, 2019, without any notice or warning, Ms. Goren terminated Dr. Wright for alleged ongoing interpersonal and communication problems. *Id.*, ¶ 31. Dr. Wright alleges that the reasons for her termination were pretextual, and that Ms. Goren discriminatorily refused to provide any specific examples of how Wright was deficient. *Id.* But notably, Plaintiff's claim of racial discrimination, as pled in Count I, does not rely on any allegations about Defendants' conduct while she was employed at the Foundation.

Seeking to avoid litigation, the Foundation and Dr. Wright negotiated and entered into a Severance Agreement in October 2019. *Id.*, ¶ 33. The agreement contained a Mutual Non-Disparagement Clause, which provides:

> You agree that you have not made, and will not make, any false, disparaging or derogatory statements to any person or entity, including any media outlet, industry group or financial institution, regarding the Foundation or any of the other Releasees, or about the Foundation's business affairs and/or financial conditions; provided, however, that nothing herein prevents you from making truthful disclosures to any governmental entity or in any litigation or arbitration.  Likewise, the Foundation will direct those officers, directors, and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding you.

*See id.*, ¶ 34; *see also* ECF No. 4-2 (Severance Agreement), ¶ 6 (emphasis in original).[2]

In November 2019, Ms. Goren, who was also the Chair of the Board of Directors for the Washington Regional Association of Grantmakers ("WRAG"), met with Dr. Madye Henson, who was then the President and CEO of WRAG.  *See* Compl., ¶ 35.  During the meeting, Ms. Goren allegedly complained that she was facing community backlash for terminating Dr. Wright.  *Id.*, ¶ 36.  Dr. Henson responded that many leaders in the community were questioning whether the decision to terminate Dr. Wright was discriminatory.  *Id.*  Ms. Goren acknowledged this perception but clarified that she terminated Dr. Wright because she was "toxic" and fostered a "negative climate" at the Foundation.  *Id.*, at 3, ¶ 37.  Dr. Wright learned of this alleged conversation by reading a complaint that Dr. Henson filed in a separate lawsuit against WRAG and Ms. Goren.  *See* Compl. at 3; *see also* ECF No. 4-3 (Amended Complaint in Case 20-cv-2943, *Madye Henson v. WRAG* ("Henson Complaint")), ¶ 48.

---

[2]   The Severance Agreement also includes a Release of Claims, which states that Defendants are released from "any and all claims arising out of . . . [Plaintiff's] employment with and/or separation from the Foundation, including, but not limited to, all claims under Title VII of the Civil Rights Act of 1964," as well as "all common law claims including, but not limited to, actions in defamation . . . and breach of contract."  *See* Severance Agreement, ¶ 3.  The Release makes clear that Plaintiff waived "not only claims presently known to [her], but also all unknown or unanticipated claims," as well as claims based on "discover[ed] facts different from what [she then] believe[d] to be true, which if known, could have materially affected this release."  *Id.*

Plaintiff then filed the instant case, alleging (1) race discrimination, in violation of 42 U.S.C. § 1981; (2) defamation; and (3) breach of contract. *See generally* Compl. Plaintiff seeks an order declaring that Defendants "intentionally and willfully denied plaintiff equal rights in the making and enforcing of the Severance Contract;" and that Defendants breached the Severance Agreement by making false, derogatory statements about Plaintiff. *See id.* at 16–17. Plaintiff also seeks compensatory, punitive, and liquidated damages. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim upon which relief can be granted." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 552 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *id.* at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor, "treat[ing] the complaint's factual allegations as true" and granting "plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations and quotation marks omitted); *accord Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Although a plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Without converting the motion into one for summary judgment, the Court may consider documents that are incorporated into the complaint, whether by being attached to it or expressly

relied upon therein. *See, e.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009); *Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motions papers may be considered without converting the motion [to dismiss] to one for summary judgment." (internal quotation and citation omitted)).

## ANALYSIS

### I.  Racial Discrimination Under 42 U.S.C. § 1981

Dr. Wright claims that Ms. Goren violated the Mutual Non-Disparagement Clause of the Severance Agreement "with racial animus" when she told Dr. Henson that Dr. Wright was "'toxic,' created 'a negative climate' at the Foundation and had to be fired." *See* Compl. at 3; *see also id.*, ¶ 37 ("Defendant Goren disparaged and defamed Dr. Wright by falsely stating Dr. Wright was 'toxic' fostered 'a negative climate' within the Meyer Foundation and had to be fired or two-thirds of the staff would leave."). Dr. Wright alleges that

> [t]he discriminatory animus is clear since Defendant Goren has not disparaged any non-African American employee who has left the company, let alone any non-African American who left the company with a contract that specifically contained a mutual non-disparagement clause. For example, in contrast to the defamation Defendant Goren heaped on Dr. Wright, Defendant Goren did not defame Dr. Wright's predecessor, a Caucasian man, who also separated from the company.

*Id.* at 3.[3]  The Foundation argues that Plaintiff's claim under Section 1981 fails because she does not allege any facts that would support a finding of racial animus. *See* Def. Mot. at 8.[4]

---

[3]  Dr. Wright further alleges, in general terms, that the Foundation "discriminatorily denied Plaintiff equal treatment on the basis of her race . . . in the terms, conditions, privileges and enforcement of her Severance Contract." *See* Compl., ¶ 39. According to Dr. Wright, Defendants' conduct in "treating Plaintiff in the manner unequal to other employees" and "failing to remedy the treatment to which Plaintiff was subjected," "show the intentional and racially motivated decision of Defendants to violate the terms and conditions of the Severance Contract." *Id.*, ¶¶ 39–41.

[4]  Defendants also argue that (1) the claim of racial discrimination is premised on a breach of the Severance Agreement, but no such breach occurred, *see* Def. Mot. at 7–8; and (2) Dr. Wright fails to establish a claim of race discrimination because her theory of liability is inherently a claim of defamation, *see id.* at 5–6. The Court agrees

Section 1981 "protects the right 'to make and enforce contracts' free from racial discrimination." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting 42 U.S.C. § 1981(a)).  Making and enforcing contracts includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  Courts use the burden-shifting *McDonnell Douglas* framework for establishing racial discrimination claims under Section 1981.  *See Carney v. Am. Univ.*, 151 F.3d 1090, 1093 (D.C. Cir. 1998); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *DeJesus v. WP Company LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (stating a plaintiff must first establish a *prima facie* case of prohibited discrimination under Section 1981).

Under the *McDonnell Douglas* framework, a plaintiff "without direct evidence of discrimination as it relates to contractual rights" must establish that "'(1) [she] is a member of a protected class, (2) [she] suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination.'"  *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)); *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Section 1981 offers relief when racial discrimination . . . impairs an existing contractual relationship.").

Thus, a plaintiff bringing a claim under Section 1981 must establish that the defendant had "an intent to discriminate on the basis of race," *Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 69 (D.D.C. 2008), or a "racially discriminatory purpose for [defendant's]

---

that Plaintiff fails to state a claim of breach of contract, as discussed, *infra*.  The Court need not resolve Defendants' other argument because the Complaint so clearly fails to state a claim of racial animus.  Nevertheless, Plaintiff's reliance on *Dickerson v. District of Columbia*, 09-cv-2213, 2019 WL 6910043, at *3 (D.D.C. Dec. 19, 2019), for the proposition that she may recover damages for intangible compensatory damages, including reputational harm, is misplaced.  *See* Pl. Opp. at 17.  As Defendant notes, the issues addressed in that case had nothing to do with whether the plaintiff stated a Section 1981 claim.  *See generally Dickerson*, 2019 WL 6910043; Def. Reply at 2.

action," *Ridley v. VMT Long Term Care Mgmt. Inc.*, 68 F. Supp. 3d 88, 91 (D.D.C. 2014). A "plaintiff cannot merely invoke [her] race in the course of a claim's narrative and automatically be entitled to pursue relief." *Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990); *see also Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 274 (D.D.C. 2011) (finding plaintiff's occasional reference to race insufficient to support a Section 1981 action); *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 88 (D.D.C. 2010) (dismissing Section 1981 claim where plaintiff's "only suggestion that [her] race or color played any role in her interactions . . . [were] conclusory statements" that she was terminated based on her race); *Mekuria v. Bank of Am.* 883 F. Supp. 2d 10, 13–16 (D.D.C. 2011) (dismissing Section 1981 claim because "[a]t the end of the day, Plaintiff's case boils down to an argument that because he was mistreated and because he is black, there must be some connection between the two.").

    Here, Dr. Wright's general allegations of racial discrimination are unsupported by facts. Plaintiff contends that Ms. Goren's statements to Dr. Henson were motivated by "racial animus," and notes that Ms. Goren did not make negative comments about other former employees, including Dr. Wright's predecessor, who was Caucasian. *See* Compl. at 3. To begin, Ms. Goren's alleged criticism of Dr. Wright—*i.e.*, that she had to be fired because she was "toxic" and "created a negative climate"—was not, on its face, related to Dr. Wright's race. *Id.* Thus, the only fact that purports to prove racial animus is that Ms. Goren allegedly did not disparage any former employees who were Caucasian. Assuming, *arguendo,* that Plaintiff has a basis to make that allegation (which would require her to know everything that Ms. Goren has said about the other employees), there obviously are numerous reasons, unrelated to race, that might explain the alleged disparate treatment. For example, perhaps Ms. Goren did not have a negative opinion of the other employees. Plaintiff's other allegations—including that the Foundation

7

"discriminatorily denied Plaintiff equal treatment on the basis of her race . . . in the terms, conditions, privileges and enforcement of her Severance Contract," Compl., ¶ 39, and that she was "disparaged in violation of the terms of the Agreement due to the Defendants' racial animus against African Americans in violation of 42 U.S.C. 1981," *id.*, ¶ 40—are too general and conclusory to state a claim of racial animus. *See Ridley*, 68 F. Supp. 3d at 91 (plaintiff must provide a factual basis to support an inference of racial discrimination—a mere invocation of race is insufficient); *Bray*, 748 F. Supp. at 5 (plaintiff must allege some facts that "demonstrate that [her] race was the reason for defendant's actions.").[5]

Thus, Dr. Wright fails to connect her race to her alleged mistreatment, and therefore fails to state a claim under Section 1981. *See Mekuria*, 883 F. Supp. 2d at 13–16. Accordingly, the Court will grant Defendants' Motion to Dismiss Count I.

## II. Defamation

Plaintiff claims that Ms. Goren defamed her when she stated to Dr. Henson that Plaintiff was "toxic" and created a "negative climate" at the Foundation. *See* Compl., ¶ 45. Defendants argue that Ms. Goren's statements to Dr. Henson are protected by the common-interest privilege and therefore are not defamatory. *See* Def. Mot. at 9–10.[6] To state a *prima facie* case of

---

[5] It bears emphasis that Dr. Wright's claim of racial discrimination is specifically focused on Ms. Goren's conduct in discussing the circumstances of Dr. Wright's termination from the Foundation with Dr. Henson, and how the statement allegedly violated the Severance Agreement with "racial animus." *See* Compl., ¶¶ 38–43. Although Dr. Wright devotes large swaths of her Complaint and her Opposition to the Motion to Dismiss to enumerating alleged discriminatory acts by Defendants while she was employed by the Foundation, those allegations are beside the point. Any claims based on allegedly discriminatory acts that occurred during Plaintiff's employment by the Foundation are presumably barred by the Release of Claims in the Severance Agreement, which precludes "any and all claims arising out of . . . [Plaintiff's employment] with and/or separation from the Foundation." *See* Severance Agreement, ¶ 3. It is also notable that the Henson Complaint, in discussing the conversation between Ms. Goren and Dr. Henson that forms the basis of Plaintiff's Section 1981 claim, does not suggest that Ms. Goren's statements during the meeting were discriminatory; instead, the Henson Complaint alleges that the actual termination of Dr. Wright from the Foundation may have been discriminatory.

[6] The Foundation further contends that even if the common-interest privilege is not applicable, the alleged statements were not defamatory because they were subjective opinion, and that Dr. Wright fails to establish harm from the alleged defamatory statement. *See* Def. Mot. at 10–11. Dr. Wright refutes both of these assertions. *See* Pl.

defamation, a plaintiff must plead "(1) that [she] was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Magazine*, 736 F.3d 528, 533–34 (D.C. Cir. 2013) (citation omitted); *see also Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 136–37 (D.D.C. 2009).

Statements are not defamatory, however, if they are protected by a qualified or absolute privilege. *See e.g.*, *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F. Supp. 2d 170, 175 (D.D.C. 2008); *White v. Fraternal Order of Police*, 909 F.2d 512, 523 (D.C. Cir. 1990). The common-interest privilege is a qualified privilege that protects "statements in which a communicator has a common interest with a listener." *Caudle v. Thomason*, 942 F. Supp. 635, 640 (D.D.C. 1996); *see also Roland v. d'Arazien*, 685 F.2d 653, 685 (D.C. Cir. 1982) (the common-interest privilege "exists when the publisher of a defamatory statement and the person to whom it is made have a common interest, and the communication is of a kind reasonably calculated to protect or further it." (citation omitted)). Qualified privileges "are based upon a public policy that recognizes that it is desirable that true information be given whenever it is reasonably necessary for the protection of the actor's own interest, the interests of a third person[,] or certain interests of the public." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990) (quoting Restatement (Second) of Torts, §§ 593–605 (Scope Note) (1977)). For a statement to fall within the protection of the common-interest privilege, the statement must have been "(1) in good faith, (2) on a subject in which the party communicating has an interest . . . [or] a duty to a person having a corresponding interest or duty; (3) to a person who has such a corresponding interest." *Armenian Assembly*,

---

Opp. at 18–19; 21–22. This Court need not address these issues as it finds that the statements were protected under the common-interest privilege.

597 F. Supp. 2d at 138 (citation omitted); *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006).

Dr. Wright alleges that she learned of Ms. Goren's allegedly defamatory statement from reading the complaint filed in a separate lawsuit brought by Dr. Henson against WRAG and Ms. Goren (the "Henson Case"). *See* Compl. at 3.[7] The allegedly defamatory statement was made by Ms. Goren to Dr. Henson during a WRAG meeting. *Id.*, ¶¶ 35–37. WRAG is a nonprofit organization in the District of Columbia that is committed to promoting racial equity. *See* Henson Compl., ¶ 17. At the time of the meeting, Dr. Henson was the President and CEO of WRAG; and Ms. Goren was both the Chair of WRAG's Board of Directors and the President and CEO of the Foundation, which was one of WRAG's largest financial contributors. *See* Compl., ¶ 35, Henson Compl. at 2–3.

The Amended Complaint in the Henson Case states, in relevant part:

> In November 2019, Dr. Henson met with Defendant Goren [in her capacity as WRAG's Chair of the Board of Directors] for an offsite one-on-one meeting to discuss various WRAG related matters. During this meeting, Defendant Goren mentioned that she was feeling backlash on account of her role in abruptly terminating Dr. Terri Wright . . . from her own organization, the Meyer Foundation. In response, Dr. Henson shared with Defendant

---

[7] The Complaint in the instant case alleges as follows:

> The way that Dr. Wright learned of this disparaging and defamatory commentary about her was by reading the allegations of a Civil Rights complaint that Dr. Henson, filed against Defendant Goren accusing Goren of orchestrating an illegal termination of Dr. Henson based on her race as an African American. This lawsuit, filed in the District of Columbia Superior Court, on June 30, 2020, bearing case number 2020 CA 002934 B, is against WRAG, Defendant Goren (Defendant Goren is WRAG's Board Chair) and others alleging discrimination and retaliation. In the complaint, Dr. Henson, who had no prior relationship with Dr. Wright, made clear that during a one on one meeting with Defendant Goren, the topic of Dr. Wright's departure came up and in response Defendant Goren made disparaging comments that were in blatant violation of Dr. Wright's contract.

Compl., at 3–4. This Court may consider the Henson Complaint without converting the Motion to Dismiss into one for summary judgment because the document is incorporated in Plaintiff's Complaint and is central to her argument. *See Marshall*, 536 F. Supp. 2d at 65–66. Plaintiff quotes extensively from the Henson Complaint in her Opposition, *see* Pl. Opp. at 13–14, and agrees that the Henson Complaint is properly considered in addressing the Motion to Dismiss, *see id*. at 20.

> Goren that the circumstances surrounding Dr. Wright's termination are being questioned by leaders in the community as many believe the termination was discriminatorily motivated. In response, Defendant Goren acknowledged that she sensed this may have been the perception, but she had no option because of the "negative climate" Dr. Wright was fostering.

*See* Henson Compl., ¶ 48.[8]

Because both Dr. Henson and Ms. Goren were leaders of WRAG, they had a common interest in protecting WRAG's reputation, particularly in the community of organizations that work on issues of racial equity. *See* Henson Compl. at 1. The Henson Complaint notes that "[t]he leading voice of WRAG is Defendant Nicola O. Goren, the Caucasian chairwoman of the Board of Directors." *Id.* at 3. Thus, WRAG's reputation and standing in the community could be affected by adverse perceptions of Ms. Goren's actions. As the Board Chair of WRAG, an organization "known nationally for the training and engagement it has done externally to challenge and address systemic racism in philanthropy," *id.* at 1, Ms. Goren would be expected to comport herself in a non-discriminatory manner, and any suspicion that Ms. Goren had discriminated against Dr. Wright would plainly affect WRAG's reputation.[9] Thus, Ms. Goren's statements to Dr. Henson concerned a subject in which both parties had a corresponding interest. *See Armenian Assembly*, 597 F. Supp. 2d at 138.

---

[8]   The Henson Complaint goes on to state:

> Next, when Dr. Henson discussed Defendant Goren's firing of Dr. Wright from the Meyer Foundation and told her that it had sent shock waves through the industry and raised issues of discriminatory conduct, Defendant Goren simply said that Dr. Wright was harmful to the Meyer Foundation because she created a "negative climate" and therefore she had to go. Dr. Henson saw this statement and action by Defendant Goren as being the stereotypical justification for people who discriminate in employment decisions based on race: nothing specific, articulable or objective.

Henson Compl. at 5.

[9]   Although Plaintiff contends that the instant Complaint and the Henson Complaint do not allege facts that support a common interest privilege, *see* Pl. Opp. at 20, the Court disagrees. The circumstances of the conversation and the participants' common interest in managing WRAG's reputation are readily inferred from the two Complaints at issue.

Dr. Wright attempts to argue that Ms. Goren's reliance on the common-interest privilege is foreclosed because she made the allegedly defamatory statement in bad faith. *See* Pl. Opp. at 20–21. Indeed, "publication with malice," which is the "equivalent of bad faith," would foreclose reliance on the privilege. *Mastro*, 447 F.3d at 858 (cleaned up) (quoting *Moss*, 580 A.2d at 1025); *see also Moss*, 580 A.2d at 1026 n.29 (malice necessary to overcome privilege "emphasize[s] bad faith and evil motive"). Malice is "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Mastro*, 447 F.3d at 858 (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983)). Moreover, "'the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose.'" *Novecon Ltd v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 567 (D.C. Cir. 1999) (quoting *Mosrie*, 467 A.2d at 477). Thus, in deciding whether a particular statement is protected by a qualified privilege, the court must "look to the primary motive" of the defendant." *Id*.

Here, the Complaint does not contain any allegations that support an inference that Ms. Goren made the statement to Dr. Henson in "bad faith" or with "malice." While Dr. Wright argues that Ms. Goren made the statement in "bad faith as she tried to cover up her own racial animus," *see* Pl. Opp. at 21, the facts alleged in the instant Complaint and in the Henson Complaint belie that claim. Ms. Goren made the allegedly defamatory statement while discussing whether her termination of Dr. Wright was perceived by some people in the philanthropic community as discriminatory; Ms. Goren's statement explained why Dr. Wright was terminated, for non-discriminatory reasons. With this context, Ms. Goren's words cannot be characterized as "malicious," as her comments were not made "without cause" or under

circumstances that would support a finding that she was motivated by "ill will." *See Marshall v. Allison*, 908 F. Supp. 2d 186, 201 (D.D.C. 2012) (an unsupported allegation of malice cannot defeat the common-interest privilege); *Mastro*, 447 F.3d at 860 (finding that the common interest applies when the primary purpose was not to sully plaintiff's reputation, but to document the events leading to plaintiff's dismissal); *see also Washburn v. Lavoie*, 437 F.3d 84, 91 (D.C. Cir. 2006) (D.C. law makes it "quite difficult for a plaintiff to overcome a qualified privilege." (citation omitted)).

Thus, the common-interest privilege plainly applies, and Plaintiff therefore fails to state a claim of defamation. The Court therefore will grant Defendants' Motion to Dismiss Count II.

### III. Breach of Contract

Dr. Wright alleges that Defendants breached the Severance Agreement when Ms. Goren made negative comments about Dr. Wright, in violation of the Mutual Non-Disparagement Clause. *See* Compl. ¶ 50. Defendants argue that the Foundation's duty under the Mutual Non-Disparagement Clause was limited to directing employees not to disparage Dr. Wright, and there are no allegations that the Foundation failed to do so. *See* Def. Mot. at 13. The Foundation relies on the following words in the Separation Agreement: "[T]he Foundation will *direct those officers, directors and employees* with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statement to any person or entity regarding you." *See* Severance Agreement, ¶ 6 (emphasis added).

Under District of Columbia law, a claim for breach of contract includes four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." *Xereas v. Heiss*, 987 F.3d 1124, 1135 (D.C. Cir. 2021) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). In interpreting a contractual provision, a court "must rely solely upon [the] language [of the

agreement] as providing the best objective manifestation of the parties' intent." *FDIC v. Parvizian, Inc.*, 944 F. Supp. 1, 3 (D.D.C. 1996); *see also Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1395 (D.C. Cir. 1997) (ambiguity cannot be imported into a facially unambiguous contract).

The Court agrees with Defendants that the facts alleged by Plaintiff do not support a finding that Defendants breached the Severance Agreement. In the Severance Agreement, the Foundation agreed only to "*direct those officers, directors and employees* with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statement to any person or entity regarding you." *See* Severance Agreement, ¶ 6 (emphasis added). The Complaint contains no allegations that the Foundation failed to honor this commitment.

Plaintiff's argument that the Severance Agreement should be read to impose an affirmative duty on the Foundation and Ms. Goren to not disparage Dr. Wright is unpersuasive. Dr. Wright argues that the parties' obligations with respect to non-disparagement should be symmetrical— *i.e.,* because she cannot disparage the Foundation under the Agreement, Ms. Goren, as a signatory, should not be able to disparage Dr. Wright. *See* Pl. Opp. at 22–23. This interpretation, however, contradicts the plain words of the Agreement, which does not prohibit Ms. Goren from making negative statements about Dr. Wright. Dr. Wright further argues that the words of the Severance Agreement are ambiguous and should be construed against the drafter, which is the Foundation. *Id.* But the Agreement is not ambiguous—the Mutual Non-Disparagement Clause plainly states that "the Foundation will direct . . . officers . . . not to make any false, disparaging or derogatory statements" about Dr. Wright. *See* Severance Agreement, ¶ 6. As a matter of law, the Court cannot adopt a proposed interpretation of the Severance Agreement that is contrary to the contract's clear and unambiguous terms. *See FDIC*, 944 F.

Supp. at 3; *see also Harford Accident & Indem. Co. v. Pro-Football, Inc.*, 127 F.3d 1111, 1114 (D.C. Cir. 1997) ("when . . . contracts are clear and unambiguous, they will be enforced by the courts as written.") (quoting *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996)).[10]

Because the Foundation agreed only to direct its officers not to disparage Dr. Wright, and because the Complaint fails to allege any facts that suggest a failure by the Foundation to abide by that agreement, Plaintiff fails to state a claim of breach of contract. Accordingly, the Court will grant the Motion to Dismiss Count III.[11]

## CONCLUSION

For the foregoing reasons, Plaintiff fails to state a claim of racial discrimination under 42 U.S.C. § 1981, defamation, or breach of contract. The Court therefore will grant Defendants' Motion to Dismiss. A separate Order will issue this day.

                                                      _____
                                                     Florence Y. Pan
                                                     United States District Judge

Date: December 29, 2021

---

[10] Dr. Wright's interpretation of the Mutual Non-Disparagement Clause cannot be sustained. The first provision of the clause reads "*[y]ou* agree that you have not made, and will not make, and false, disparaging or derogatory statements . . . regarding the Foundation. *See* Severance Agreement, ¶ 6 (emphasis added). The second clause reads "*the Foundation* will direct those officers, directors and employees . . . not to make any false, disparaging or derogatory statements to any person or entity regarding *you*." *Id.* (emphasis added). In reading these clauses in concert with each other, "you" clearly refers to Dr. Wright. Thus, the first clause applies only to Dr. Wright, and not to the Foundation.

[11] The Foundation further argues that Ms. Goren in her individual capacity was not a party to the Severance Agreement, and therefore cannot be liable for breach of contract. *See* Def. Mot. at 12–13; *but see* Pl. Opp. at 22–25 (contending that Goren was party to Severance Agreement). Regardless of whether Ms. Goren could be held responsible for the Foundation's breach of the Agreement, the Court concludes that no such breach occurred. *See supra.* Thus, the Court need resolve this issue.